**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| AMIE SIMPSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | 12cv1101 |
| BANK OF AMERICA, N.A., | ) | Judge Matthew F. Kennelly |
| successor by merger to | ) | Magistrate Judge Susan E. Cox |
| BAC HOME LOANS SERVICING, LP; | ) | |
| SETERUS, INC.; | ) | |
| and JOHN DOE, | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

### INTRODUCTION

1.      Plaintiff  brings this action to secure redress from unlawful mortgage servicing practices engaged in by defendants, Bank of America, N.A., BAC Home Loan Servicing , LP (collectively "Bank of America"), and Seterus, Inc. ("Seterus").  Plaintiff alleges violation of the Cranston-Gonzales amendments to the Real Estate Settlement Procedures Act, 12 U.S.C. §2601 et seq. ("RESPA"), the Fair Debt Collection Practices Act, 15 U.S.C. 1692 et seq. ("FDCPA"), breach of contract, and violation of the Illinois Consumer Fraud Act, 815 ILCS 505/2.

### JURISDICTION AND VENUE

2.      This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337 and 1367, 12 U.S.C. §2605, and 15 U.S.C. §1692k.

3.      Venue in this District is proper because each defendant does or transacts business in this District.

1

## PARTIES

4. Plaintiff Amie Simpson resides in a home which she owns in Plainfield, Illinois.

5. Defendant Bank of America, N.A., successor by merger to BAC Home Loans Servicing, LP ("BAC") is a federally chartered corporation with offices at 135 S. LaSalle Street, Chicago, Illinois 60603.

6. Defendant Bank of America, N.A. is engaged in the residential mortgage servicing business, servicing millions of dollars of residential mortgages.

7. Defendant Seterus, Inc., formerly known as IBM Lender Business Process Services, Inc., is a Delaware corporation with its principal offices at 14523 SW Millikan Way, Suite 200, Beaverton, OR 97005.  It does business in Illinois.  Its registered agent and office is CT Corporation System, 208 S. LaSalle Street, Suite 814, Chicago, IL 60604.

8. Defendant Seterus, Inc. is engaged in the residential mortgage servicing business, servicing millions of dollars of residential mortgages.

9. Defendant Seterus, Inc. regularly acquires servicing of loans which are actually or allegedly delinquent at the time of acquisition.

10. Defendant John Doe is the owner of plaintiff's loan.  The identity of John Doe is not known to plaintiff.

## FACTS

11. In 2009, plaintiff requested a loan modification for her residential mortgage loan from BAC Home Loans Servicing, LP, which was then servicing it.  Although it was often a struggle, plaintiff never missed a mortgage payment prior to applying for the loan

modification.

12.     BAC approved plaintiff for a temporary loan modification pursuant to the HAMP program which began in January 2010.  Plaintiff made all three required trial payments, and continued to make timely trial payments until she was approved for a permanent loan modification.

13.     The permanent loan modification was finally signed in April 2010.   A copy of the permanent loan modification is attached as <u>Exhibit A</u>.  The mortgage and note being modified, which were obtained in August 2006, are attached as <u>Exhibit B</u>.

14.     <u>Exhibit A</u> provided for a new loan balance of $299,912.74, and that all past due interest, servicing expenses, and escrow paid to third parties and $2,940.02 in escrow advances were added to that principal balance.   Plaintiff had never missed a mortgage payment at that point, and thus should not have had a past due balance.

15.     <u>Exhibit A</u> also provided that, "Your total monthly payments will be due on the 1st of the month starting May 1, 2010."  Plaintiff therefore made her next mortgage payment on or about April 29, 2010 via telephone, in order to comply with BAC's deadline.

16.     Unbeknownst to plaintiff, instead of applying plaintiff's payment to the payment due on May 1, 2010, defendant BAC, instead applied the payment to either a suspense account and/or an alleged past due balance, despite the fact that the alleged past due balance was included in the loan modification principal balance, and the fact that Ms. Simpson had never missed a mortgage payment.  This resulted in it appearing that the May payment had not been made.

17.     Thereafter, BAC  treated all of plaintiff's payments as delinquent, even

though plaintiff never missed a payment and made each and every payment in a timely manner. Because of the alleged "past due" status which resulted from this mistake, plaintiff was forced to pay her mortgage by phone every month and had to endure lengthy waits on the phone each time she made a payment.

18.     Plaintiff complained to BAC's representatives by phone about the misapplied payment on numerous occasions, including in October, November and December of 2010, and in March and May of 2011.  The representatives informed her that BAC had made an error and was working to fix it, but they were very "backed up" due to the number of people experiencing this type of problem.   The BAC representatives counseled plaintiff to be patient because the problem would eventually be fixed.

19.     Plaintiff continued to pay her mortgage on time every month, either by phone or in person at a Bank of America branch.  She made her October 2011 payment by telephone on September 30, 2011.

20.     BAC merged with Bank of America in July 2011. Bank of America, N.A. then transferred servicing of plaintiff's loan to Seterus, Inc., effective October 1, 2011.  Bank of America, N.A. did not inform plaintiff of the transfer of her loan, nor did it correct its prior mistake before transferring the loan.

21.     Neither Bank of America nor Seterus notified Ms. Simpson of the transfer of servicing until on or around October 12, 2011, after Ms. Simpson made her October mortgage payment to Bank of America.  Plaintiff's Transfer of Servicing Notice is attached as Exhibit C. If plaintiff had been informed of the servicing transfer in a timely manner, she would have made the payment to Seterus and not to Bank of America.

22.     Seterus, Inc. treated plaintiff's loan as delinquent at the time servicing was transferred to it.

23.     Ms. Simpson began receiving calls from Seterus in early October 2011 informing her that her payment was overdue.  When she informed them she had already made the payment to Bank of America, they said they would contact Bank of America about the payment, however, they continued to call her about the missing payment, sometimes multiple times a day.

24.     On October 23, 2011, plaintiff sent Seterus, Inc. the letter attached as Exhibit D, complaining that Seterus, Inc. was erroneously treating her loan as delinquent and demanding that she make an additional payment.

25.     On November 6, 2011, Seterus, Inc. sent plaintiff the letter attached as Exhibit E.

26.     On November 15, 2011, Seterus, Inc. sent plaintiff the letter attached as Exhibit F, refusing to correct the misapplication of payments on April 30, 2010.

27.     Exhibit F claims that BAC / Bank of America did not implement the modification on its books until June 9, 2010, that "any funds received prior to the implementation of the modification terms were eligible for credit toward the delinquent balance of the loan," and that the funds received on April 30, 2010 were "credited to your suspense account."  Exhibit F claims that plaintiff had to make an additional monthly payment to have her loan considered current.

28.     This explanation is frivolous and not in good faith, in that (a) the modification required plaintiff to make a payment no later than May 1, 2010, (b) plaintiff could

be expected to transfer funds one day early to make sure the payment was on time, (c) plaintiff had no control over whether BAC/ Bank of America implemented the modification on its books on June 9, 2010 or some other date, (d) had plaintiff waited until June 9, 2010 to make her May 1, 2010 modification payment, she would have been in breach, (e) plaintiff never missed a mortgage payment and thus should not have had a "delinquent balance," and (e) plaintiff's note and mortgage do not authorize a "suspense account."

29.     Since plaintiff's loan was transferred to Seterus, plaintiff has received multiple collection calls claiming that her loan is still delinquent.  The calls have continued after Ms. Simpson sent the October 23, 2011 letter, and when Ms. Simpson asked that the calls be stopped until the inquiry was resolved, Seterus's employees told Ms. Simpson that they would not stop the calls.   The calls were extremely upsetting to Ms. Simpson, and often brought her to tears.

30.     For example, on Saturday, November 26, 2011, plaintiff received four collection calls from Seterus.

31.     Because the dispute has not been resolved, plaintiff has been forced to spend time every month paying her mortgage by phone, because the internet payment system would only allow her to pay the alleged missing payment along with the current payment, and she was told if she paid by mail, the payment would be applied to the alleged missing payment, which would result in her account continuing to appear as past due.  Ms. Simpson believes that she has paid a fee for doing so on at least one occasion, although Seterus sometimes waived the fee.

32.     After receiving the letter from Ms. Simpson's counsel, Seterus made it

even more inconvenient for Ms. Simpson to make her mortgage payments. When Ms. Simpson

called to make her payments, she was informed that she could not make a payment until it was

approved by a supervisor. Ms. Simpson was then forced to wait a lengthy period until a

supervisor becomes available to approve the transaction.

33.    Plaintiff has been damaged by defendants' conduct, in that she has

suffered emotional distress due to the continued harassment and aggravation, in that her

mortgage has wrongfully been treated as delinquent, in that she has wrongfully been assessed

late fees and/or additional interest and charges, and in that her credit score has been negatively

affected.

34.    Defendants' conduct has been willful and irresponsible.

35.    The Bank of America defendants have been accused in a whistle blower

action of deliberately mishandling loan modification applications, including deliberately failing

to properly post payments made pursuant to loan modifications and making misrepresentations

to borrowers about loan modifications. (E.D.N.Y., No. 1:11-cv-3270) <u>Exhibit G</u> The whistle

blower case also alleges that Bank of America deliberately delayed implementation of permanent

HAMP loan modifications, and that many of  Bank of America's customer service

representatives did not have the ability to resolve customer complaints, but instead were charged

with processing and "closing" complaints in order to give the illusion to government regulators

that Bank of America was responsive to its customers.

36.    The Bank of America defendants have been repeatedly sued for damaging

homeowner's credit in connection with their mortgage loan servicing and loan modification

procedures, and for mishandling loan modifications and qualified written requests from

borrowers.  These suits include <u>Bradshaw v. BAC Home Loans Servicing, L.P.</u>, 2011 U.S.Dist.

Lexis 110781 (D.Or. Sep. 27, 2011), and an MDL involving over twenty consolidated class

actions pending in Massachusetts (D.Mass. Case No. 1:10-md-2193-RWZ).  In addition, Bank of

America was one of the defendants in a recently settled enforcement action brought by the

United State and 49 state attorney's general, which accused Bank of America of various abusive

practices in connection with mortgage servicing.

      37.    At no time have defendants notified plaintiff of the name of their

principal.

      38.    Defendants were therefore acting as agents of an undisclosed principal.

### **COUNT I – CRANSTON GONZALES ACT**

      39.    Plaintiff incorporates paragraphs  1-38.

      40.    This claim is against Seterus, Inc.

      41.    <u>Exhibit D</u> is a "qualified written request" as defined in the

Cranston-Gonzales amendment to RESPA, 12 U.S.C. §2605(e).

      42.    In violation of its obligations under the Cranston-Gonzales amendment,

defendant Seterus, Inc. (a) failed to take corrective action and (b) continued to treat plaintiff's

loan as delinquent.

      43.    Defendant Seterus, Inc. has a pattern and practice of ignoring qualified

written requests.

      WHEREFORE, plaintiff requests that the Court enter judgment in favor of the

plaintiff and against defendant Seterus, Inc. for:

      (1)    Actual damages;

(2)     Statutory damages;

(3)     Attorney's fees, litigation expenses and costs of suit;

(4)     Such other or further relief as the Court deems proper.

### COUNT II- CRANSTON GONZALES ACT

44.     Plaintiff incorporates paragraphs 1-38.

45.     This claim is against Bank of America, N.A. and BAC Home Loan Servicing, LP.

46.     In violation of its obligations under 12 U.S.C. §2605(b)-(c), Bank of America failed to provide notice of transfer of service of plaintiff's mortgage at the time of the transfer.

47.     15 U.S.C. §2605(b)-(c) provides:

**(b) Notice by transferor or loan servicing at time of transfer.**

**(1) Notice requirement. Each servicer of any federally related mortgage loan shall notify the borrower in writing of any assignment, sale, or transfer of the servicing of the loan to any other person.**

**(2) Time of notice.**

**(A) In general. Except as provided under subparagraphs (B) and (C), the notice required under paragraph (1) shall be made to the borrower not less than 15 days before the effective date of transfer of the servicing of the mortgage loan (with respect to which such notice is made).**

**(B) Exception for certain proceedings. The notice required under paragraph (1) shall be made to the borrower not more than 30 days after the effective date of assignment, sale, or transfer of the servicing of the mortgage loan (with respect to which such notice is made) in any case in which the assignment, sale, or transfer of the servicing of the mortgage loan is preceded by--**

**(I) termination of the contract for servicing the loan for cause;**

(ii) commencement of proceedings for bankruptcy of the servicer; or

(iii) commencement of proceedings by the Federal Deposit Insurance Corporation or the Resolution Trust Corporation for conservatorship or receivership of the servicer (or an entity by which the servicer is owned or controlled).

(C) Exception for notice provided at closing. The provisions of subparagraphs (A) and (B) shall not apply to any assignment, sale, or transfer of the servicing of any mortgage loan if the person who makes the loan provides to the borrower, at settlement (with respect to the property for which the mortgage loan is made), written notice under paragraph (3) of such transfer.

(3) Contents of notice. The notice required under paragraph (1) shall include the following information:

(A) The effective date of transfer of the servicing described in such paragraph.

(B) The name, address, and toll-free or collect call telephone number of the transferee servicer.

(C) A toll-free or collect call telephone number for (I) an individual employed by the transferor servicer, or (ii) the department of the transferor servicer, that can be contacted by the borrower to answer inquiries relating to the transfer of servicing.

(D) The name and toll-free or collect call telephone number for (I) an individual employed by the transferee servicer, or (ii) the department of the transferee servicer, that can be contacted by the borrower to answer inquiries relating to the transfer of servicing.

(E) The date on which the transferor servicer who is servicing the mortgage loan before the assignment, sale, or transfer will cease to accept payments relating to the loan and the date on which the transferee servicer will begin to accept such payments.

(F) Any information concerning the effect the transfer may have, if any, on the terms of or the continued availability of mortgage life or disability insurance or an other type of optional insurance and what action, if any, the borrower must take to maintain coverage.

(G) A statement that the assignment, sale, or transfer of the servicing of the mortgage loan does not affect any term or condition of the security instruments other than terms directly related to the servicing of such loan.

(c) Notice by transferee or loan servicing at time of transfer.

(1) Notice requirement. Each transferee servicer to whom the servicing of an federally related mortgage loan is assigned, sold, or transferred shall notify the borrower of any such assignment, sale, or transfer.

(2) Time of notice.

(A) In general. Except as provided in subparagraphs (B) and (C), the notice required under paragraph (1) shall be made to the borrower not more than 15 days after the effective date of transfer of the servicing of the mortgage loan (with respect to which such notice is made).

(B) Exception for certain proceedings. The notice required under paragraph (1) shall be made to the borrower not more than 30 days after the effective date of assignment, sale, or transfer of the servicing of the mortgage loan (with respect to which such notice is made) in any case in which the assignment, sale, or transfer of the servicing of the mortgage loan is preceded by--

(I) termination of the contract for servicing the loan for cause;

(ii) commencement of proceedings for bankruptcy of the servicer; or

(iii) commencement of proceedings by the Federal Deposit Insurance Corporation or the Resolution Trust Corporation for conservatorship or receivership of the servicer (or an entity by which the servicer is owned or controlled).

(C) Exception for notice provided at closing. The provisions of subparagraphs (A) and (B) shall not apply to any assignment, sale, or transfer of the servicing of any mortgage loan if the person who makes the loan provides to the borrower, at settlement (with respect to the property for which the mortgage loan is made), written notice under paragraph (3) of such transfer.

**(3) Contents of notice. Any notice required under paragraph (1) shall include the information described in subsection (b)(3).**

WHEREFORE, plaintiff requests that the Court enter judgment in favor of the plaintiff and against the Bank of America defendants for:

(1)     Actual damages;

(2)     Statutory damages;

(3)     Attorney's fees, litigation expenses and costs of suit;

(4)     Such other or further relief as the Court deems proper.

## COUNT III – FAIR DEBT COLLECTION PRACTICES ACT

48.     Plaintiff incorporates paragraphs 1-38.

49.     This claim is against Seterus, Inc.

50.     Defendant Seterus, Inc. has violated 15 U.S.C. §§1692e, 1692e(2), 1692e(10), 1692f and 1692f(1) by repeatedly representing that plaintiff's loan is delinquent, when it is not, attempting to collect an additional monthly payment, which was not owed, and continuing to make collection calls after being requested to stop.

51.     Section 1692e provides:

**§ 1692e.       False or misleading representations [Section 807 of P.L.]**

**A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section: . . .**

**(2)     The false representation of--**

**(A)     the character, amount, or legal status of any debt; . . .**

**(10)     The use of any false representation or deceptive means to**

collect or attempt to collect any debt or to obtain information concerning a consumer. . . .

52. Section 1692f provides:

**§ 1692f.          Unfair practices [Section 808 of P.L.]**

**A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:**

**(1)     The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law. . . .**

WHEREFORE, plaintiff requests that the Court enter judgment in favor of the plaintiff and against defendant Seterus, Inc. for:

(1)     Actual damages;

(2)     Statutory damages;

(3)     Attorney's fees, litigation expenses and costs of suit;

(4)     Such other or further relief as the Court deems proper.

## COUNT IV – BREACH OF CONTRACT

53. Plaintiff incorporates paragraphs 1-38.

54. This claim is against all defendants.

55. Defendants breached their contract (note, mortgage and modification) by misapplying plaintiff's May 2010 mortgage payment and by treating plaintiff's loan as being in default when it was not, despite the fact that the mortgage modification contract clearly provided that the first payment was due on May 1, 2010, and despite the fact that the loan modification document provided that all past due amounts had been added to the loan modification balance.

Defendants also breached the mortgage contract by imposing late charges, when Ms. Simpson's payments were not late.

56.     In addition, every contract contains an implied covenant of good faith and fair dealing.   Defendants breached the covenant of good faith and fair dealing when they refused to properly apply Ms. Simpson's May 1, 2010 mortgage payment, and instead treated plaintiff's mortgage as if it were in default.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of the plaintiff and against defendants for:

       (1)     Actual damages;

       (2)     An order requiring defendants to correct the misapplication of plaintiff's payment;

       (3)     Costs of suit;

       (4)     Such other or further relief as the Court deems proper.

## COUNT V – VIOLATION OF ILLINOIS CONSUMER FRAUD ACT

57.     Plaintiff incorporates paragraphs 1 - 38.

58.     This claim is against Bank of America, N.A. and BAC Home Loan Servicing, LP.

59.     Bank of America engaged in unfair and deceptive acts and practices, in violation of 815 ILCS 505/2, when it unilaterally decided to apply her May 1, 2010 mortgage payment to a suspense account and/or an alleged past due balance (which had already been incorporated into the new principal balance pursuant to the loan modification, if it even existed), and then began treating plaintiff's mortgage as delinquent and imposing monthly late charges.

60.     Bank of America made an affirmative misrepresentation and engaged in an unfair practice when it (1) informed plaintiff that her loan modification was effective May 1, 2010, and that her first payment under the modification was due by May 1, 2010, when it in fact treated the modification as if it started in June 2010, (2) applied the May payment to a suspense account and/or an alleged past due balance which had already been incorporated into the loan modification principal balance, if it even existed, and (3) refused to properly credit the May payment despite repeated requests by plaintiff.

61.     The fact that a payment made on April 29, 2010 would not be applied to the May mortgage payment, but would instead be applied to a suspense account and/or an alleged past due balance which had already been incorporated into the loan modification principal balance, was a material fact which should have been disclosed to Ms. Simpson.

62.     Based on comments made to Ms. Simpson by Bank of America's representatives, and allegations made in Exhibit G, Bank of America appears to have a pattern of misapplying payments made by borrowers with loan modifications.

63.     What happened to Ms. Simpson was not an isolated incident.  Bank of America has a pattern and practice of abusive practices in connection with its mortgage servicing operations.  A recently filed whistle blower suit accuses Bank of America of deliberately mishandling loan modification applications and making misrepresentations to homeowners regarding loan modifications.  The whistle blower case accuses Bank of America of, among other things, failing to properly credit payments made by borrowers with loan modifications, delaying implementation of permanent loan modifications and failing to respond to customer complaints.  Exhibit G  In addition, Bank of America has been sued repeatedly for ignoring

15

borrower's disputes regarding its mortgage servicing, loan modification and credit reporting practices. Bank of America is also a party to a recent settlement of an enforcement action brought by the United States and 49 state attorney's generals in which Bank of America was accused of various abusive mortgage servicing practices.

64. Bank of America engaged in such conduct in the course of trade and commerce.

65. Bank of America engaged in such conduct knowing that it would injure Ms. Simpson, and Ms. Simpson did indeed suffer monetary damages as a result of BAC's conduct, because Bank of America has imposed late charges on her account and required her to pay fees in order to pay by phone. In addition, if Bank of America did not adjust the loan modification principal balance when it applied the loan modification payment to the alleged past due balance (which was already incorporated into the loan modification principal balance, if it even existed), plaintiff is being forced to pay additional interest. Finally, Bank of America damaged Ms. Simpson's credit.

WHEREFORE, the Court should enter judgment in favor of Ms. Simpson and against defendants:

(1) Awarding compensatory and punitive damages;

(2) Awarding attorney's fees, litigation expenses and costs;


(3) Awarding such other and further relief as the Court deems proper.

s/Daniel A. Edelman
Daniel A. Edelman

16

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Tara L. Goodwin
Rupali R. Shah
EDELMAN, COMBS, LATTURNER
      & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)

## JURY DEMAND

Plaintiff demands trial by jury.

s/Daniel A. Edelman
Daniel A. Edelman



EXHIBIT A



May 6, 2010

AMIE SIMPSON



Loan Number:

Dear AMIE SIMPSON :

Thank you for complying with the terms of the Home Affordable Modification Trial Period Plan by providing your financial information and making your trial payments. You are now eligible for a permanent modification.

The enclosed Home Affordable Modification Agreement ("Modification Agreement") reflects the new terms of your modified mortgage that will go into effect at the end of the Trial Period and once you complete and return the enclosed documentation.

**How to Accept This Offer:**

To accept this modification offer, **you must sign, in front of a notary, two of the enclosed copies** of the Modification Agreement and **return them to us by May 16, 2010.** Please keep the third copy of the Modification Agreement for your records. The Modification Agreement must be signed by all borrowers.

We are personally delivering the Modification Agreement to you with a mobile notary who can notarize your signature at no additional charge, ensure that your documents are executed correctly and return the documents to us. Please provide both signed copies of the documents to the notary, who will return the documents to us for processing.

The modification of your loan will be effective on May 1, 2010. This means that your first payment under your permanent modification also will be due on that date. In order to have enough time to process your modification after we received your final trial period payment, we have extended your trial period by one month and the effective date reflects this extension. You are not required to make another trial period payment during the extension month. However, if you do not make a trial period payment during the extension month, please be aware that you will not accrue the monthly incentive for that month, and you will increase the amount of delinquent interest that will be capitalized as part of your modification. You can refer to the enclosed Summary for more information on the incentive and capitalization terms.

To better understand the proposed terms of your modified mortgage, please read the attached summary of your modified mortgage and the Modification Agreement carefully. If you have any questions, please call us at 1.877.422.1761.

We appreciate your cooperation and look forward to taking the final steps to providing you with more affordable mortgage payments.

Sincerely,

Loan Modification Team
Bank of America Home Loans Servicing, LP

# HELPING YOU STAY IN YOUR HOME.



MAKING
HOME
AFFORDABLE



Mortgages funded and administered by an ⌂ Equal Housing Lender.
♻ Protect your personal information before recycling this document.

BAC Home Loans Servicing, LP
Attn: Home Retention Division
4500 Amon Carter Blvd
Fort Worth, TX 76155

**Bank of America**  **Home Loans**

**Property Address:**
AMIE SIMPSON

Notice Date: 5/6/2010
Loan No.:
**Please Return the Enclosed Documents By: 5/16/2010**

### Loan Modification
### CLARITY COMMITMENT ™

Thank you for working with BAC Home Loans Servicing, LP, a subsidiary of Bank of America, N.A., on your current mortgage needs and for making your trial period mortgage payments. This summary is intended to be a clear and simple description of the final loan modification that we are pleased to offer you. Once you sign and return the enclosed Home Affordable Modification Agreement, you will have agreed to the new permanent loan modification. Please thoroughly review all the materials in the enclosed package to ensure you understand the details of this new agreement.

**Summary of Your Modified Loan**

Your new loan balance is $299,912.74. Past due interest, servicing expenses paid to third parties and escrow advances of $2,940.02 have been added to your principal balance to calculate this new loan balance. Unpaid late fees are not included in this amount and will be waived when your loan modification is finalized.

Your new interest rate that will be in effect for the first 5 years of your modified loan is 2.000%. This rate will annually increase by one percent a year thereafter until it reaches 5.000%. To further lower your monthly payment we have extended the length of your loan to 36 years. Your new final payment date and your new maturity date is 4/01/2046.

Each month you make on-time payments, you may be eligible for incentive payments under the Home Affordable Modification Program to be applied to your principal balance on the 1st-5th anniversaries of the Trial Period Plan Effective Date, provided your loan does not become 90 days delinquent at any time.

**Your New Mortgage Payments**

Your new total modified monthly mortgage payments of $2,167.20 are made up of principal and interest of $974.46, and an initial escrow amount of $1,192.74. Escrow payments are collected for payment of items such as property taxes and insurance and may change. We will notify you of any adjustments to the total monthly payment. Your total monthly payments will be due on the 1st of the month starting May 1, 2010.

Your interest rate will adjust to slowly bring your rate to 5% and your total monthly payments to $2,609.20, as shown in the schedule below. The amount of these payments will change if your escrow payment amount changes.

- Years 1-5, beginning 5/01/2010 the interest rate will be 2.000% with a total monthly payment of $2,167.20
- Years 6, beginning 5/01/2015, the interest rate will be 3.000% with a total monthly payment of $2,308.42
- Years 7, beginning 5/01/2016, the interest rate will be 4.000% with a total monthly payment of $2,456.12
- Years 8-36, beginning 5/01/2017, the interest rate will be 5.000% with a total monthly payment of $2,609.20

**If you have questions regarding the Modification Agreement or the steps you must take to complete this process, please contact us at 1.877.422.1761 to speak with one of our home retention associates.**

Investor Loan #:

**After Recording Return To:**
Home Retention Group
9700 Bissonnet Street
Suite 1500
Houston, TX 77036

This document was prepared by Home Retention Services

_____[Space Above This Line For Recording Data]_____

# HOME AFFORDABLE MODIFICATION AGREEMENT
## (Step Two of Two-Step Documentation Process)

Borrower ("I")[1]: AMIE SIMPSON
Lender or Servicer ("Lender"): BAC Home Loans Servicing, LP
Date of first lien mortgage, deed of trust, or security deed ("Mortgage") and Note ("Note"): August 25, 2006
Loan Number:
Property Address [and Legal Description if recordation is necessary] ("Property"):

MERS:
*"MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee
for Lender and Lender's successors and assigns. MERS is organized and existing under the laws of Delaware, and has an
address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, (888) 679-MERS.*

If my representations in Section 1 continue to be true in all material respects, then this Home Affordable Modification
Agreement ("Agreement") will, as set forth in Section 3, amend and supplement (1) the Mortgage or Deed of Trust
("Mortgage") on the Property, and (2) the Note secured by the Mortgage. The Mortgage and Note together, as they may
previously have been amended, are referred to as the "Loan Documents." Capitalized terms used in this Agreement and not
defined have the meaning given to them in Loan Documents.

I understand that after I sign and return two copies of this Agreement to the Lender, the Lender will send me a signed copy of
this Agreement. This Agreement will not take effect unless the preconditions set forth in Section 2 have been satisfied.

1. **My Representations.** I certify, represent to Lender and agree:

   A. I am experiencing a financial hardship, and as a result, (i) I am in default under the Loan Documents, and (ii)
      I do not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments
      now or in the near future;

   B. I live in the Property as my principal residence, and the Property has not been condemned;

   C. There has been no change in the ownership of the Property since I signed the Loan Documents;

   D. I have provided documentation for **all** income that I receive (and I understand that I am not required to
      disclose any child support or alimony that I receive, unless I wish to have such income considered to qualify
      for the Home Affordable Modification program ("Program"));

---

[1] If there is more than one Borrower or Mortgagor executing this document, each is referred to as "I". For purposes of this document words signifying the
singular (such as "I") shall include the plural (such as "we") and vice versa where appropriate.

MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3157  3/09 (rev. 8/09) (page 1 of 6 pages)




E. Under penalty of perjury, all documents and information I have provided to Lender in connection with this Agreement, including the documents and information regarding my eligibility for the program, are true and correct;

F. If Lender requires me to obtain credit counseling in connection with the Program, I will do so; and

G. I have made or will make all payments required under a Trial Period Plan or Loan Workout Plan.

2. **Acknowledgements and Preconditions to Modification.** I understand and acknowledge that:

A. If prior to the Modification Effective Date as set forth in Section 3 the Lender determines that any of my representations in Section 1 are no longer true and correct, the Loan Documents will not be modified and this Agreement will terminate. In this event, the Lender will have all of the rights and remedies provided by the Loan Documents; and

B. I understand that the Loan Documents will not be modified unless and until (i) I receive from the Lender a copy of this Agreement signed by the Lender, and (ii) the Modification Effective Date (as defined in Section 3) has occurred. I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Agreement.

3. **The Modification.** If my representations in Section 1 continue to be true in all material respects and all preconditions to the modification set forth in Section 2 have been met, the Loan Documents will automatically become modified on May 1, 2010 (the "Modification Effective Date") and all unpaid late charges that remain unpaid will be waived. I understand that if I have failed to make any payments as a precondition to this modification under a workout plan or trial period plan, this modification will not take effect. The first modified payment will be due on May 1, 2010.

A. The new Maturity Date will be: April 1, 2046.

B. The modified Principal balance of my Note will include all amounts and arrearages that will be past due as of the Modification Effective Date (including unpaid and deferred interest, fees, escrow advances and other costs, but excluding unpaid late charges, collectively, "Unpaid Amounts") less any amounts paid to the Lender but not previously credited to my Loan . The new principal balance of my Note will be $299,912.74 (the "New Principal Balance"). I understand that by agreeing to add the Unpaid Amounts to the outstanding principal balance, the added Unpaid Amounts accrue interest based on the interest rate in effect under this Agreement. I also understand that this means interest will now accrue on the unpaid interest that is added to the outstanding principal balance, which would not happen without this Agreement.

C. Interest at the rate of 2.000% will begin to accrue on the New Principal Balance as of April 1, 2010 and the first new monthly payment on the New Principal Balance will be due on May 1, 2010. My payment schedule for the modified Loan is as follows: .

| Years | Interest Rate | Interest Rate Change Date | Monthly Principal and Interest Payment Amount | Estimated Monthly Escrow Payment Amount* | Total Monthly Payment* | Payment Begins On | Number of Monthly Payments |
|---|---|---|---|---|---|---|---|
| 1-5 | 2.000% | April 1, 2010 | $674.46 | $1,192.74, may adjust periodically | $2,167.20, may adjust periodically | May 1, 2010 | 60 |
| 6 | 3.000% | April 1, 2015 | $1,115.68 | May adjust periodically | May adjust periodically | May 1, 2015 | 12 |
| 7 | 4.000% | April 1, 2016 | $1,263.36 | May adjust periodically | May adjust periodically | May 1, 2016 | 12 |
| 8-36 | 5.000% | April 1, 2017 | $1,416.46 | May adjust periodically | May adjust periodically | May 1, 2017 | 348 |

*The escrow payments may be adjusted periodically in accordance with applicable law and therefore my total monthly payment may change accordingly.





The above terms in this Section 3.C. shall supersede any provisions to the contrary in the Loan Documents, including but not limited to, provisions for an adjustable or step interest rate.

I understand that, if I have a pay option adjustable rate mortgage loan, upon modification, the minimum monthly payment option, the interest-only or any other payment options will no longer be offered and that the monthly payments described in the above payment schedule for my modified loan will be the minimum payment that will be due each month for the remaining term of the loan. My modified loan will not have a negative amortization feature that would allow me to pay less than the interest due resulting in any unpaid interest to be added to the outstanding principal balance.

THIS LOAN IS PAYABLE IN FULL AT MATURITY. YOU MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE LOAN AND UNPAID INTEREST THEN DUE. THE LENDER IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME. YOU WILL, THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN, OR YOU WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER YOU HAVE THIS LOAN WITH, WILLING TO LEND YOU THE MONEY. IF YOU REFINANCE THIS LOAN AT MATURITY, YOU MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN EVEN IF YOU OBTAIN REFINANCING FROM THE SAME LENDER.

D.  I will be in default if I do not comply with the terms of the Loan Documents, as modified by this Agreement.

E.  If a default rate of interest is permitted under the Loan Documents, then in the event of default under the Loan Documents, as amended, the interest that will be due will be the rate set forth in Section 3.C.

4.  **Additional Agreements.** I agree to the following:

A.  That all persons who signed the Loan Documents or their authorized representative(s) have signed this Agreement, unless (i) a borrower or co-borrower is deceased; (ii) the borrower and co-borrower are divorced and the property has been transferred to one spouse in the divorce decree, the spouse who no longer has an interest in the property need not sign this Agreement (although the non-signing spouse may continue to be held liable for the obligation under the Loan Documents); or (iii) the Lender has waived this requirement in writing.

B.  That this Agreement shall supersede the terms of any modification, forbearance, Trial Period Plan or Workout Plan that I previously entered into with Lender.

C.  To comply, except to the extent that they are modified by this Agreement, with all covenants, agreements, and requirements of Loan Documents including my agreement to make all payments of taxes, insurance premiums, assessments, Escrow Items, impounds, and all other payments, the amount of which may change periodically over the term of my Loan.

D.  That this Agreement constitutes notice that the Lender's waiver as to payment of Escrow Items, if any, has been revoked, and I have been advised of the amount needed to fully fund my Escrow Account.

Funds for Escrow Items. I will pay to Lender on the day payments are due under the Loan Documents as amended by this Agreement, until the Loan is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over the Mortgage as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under the Loan Documents; (d) mortgage insurance premiums, if any, or any sums payable to Lender in lieu of the payment of mortgage insurance premiums in accordance with the Loan Documents; and (e) any community association dues, fees, and assessments that Lender requires to be escrowed. These items are called "Escrow Items." I shall promptly furnish to Lender all notices of amounts to be paid under this Section 4.D. I shall pay Lender the Funds for Escrow Items unless Lender waives my obligation to pay the Funds for any or all Escrow Items. Lender may waive my obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, I shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require.




My obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in the Loan Documents, as the phrase "covenant and agreement" is used in the Loan Documents. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may exercise its rights under the Loan Documents and this Agreement and pay such amount and I shall then be obligated to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with the Loan Documents, and, upon such revocation, I shall pay to Lender all Funds, and in such amounts, that are then required under this Section 4.D.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under the Real Estate Settlement Procedures Act ("RESPA"), and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of · Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge me for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays me interest on the Funds and applicable law permits Lender to make such a charge. Unless an agreement is made in writing or applicable law requires interest to be paid on the Funds, Lender shall not be required to pay me any interest or earnings on the Funds. Lender and I can agree in writing, however, that interest shall be paid on the Funds. Lender shall provide me, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to me for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify me as required by RESPA, and I shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify me as required by RESPA, and I shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by the Loan Documents, Lender shall promptly refund to me any Funds held by Lender.

E. That the Loan Documents are composed of duly valid, binding agreements, enforceable in accordance with their terms and are hereby reaffirmed.

F. That all terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect; nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents; and that except as otherwise specifically provided in, and as expressly modified by, this Agreement, the Lender and I will be bound by, and will comply with, all of the terms and conditions of the Loan Documents.

G. That, as of the Modification Effective Date, notwithstanding any other provision of the Loan Documents, I agree as follows: If all or any part of the Property or any interest in it is sold or transferred without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Mortgage. However, Lender shall not exercise this option if state or federal law, rules or regulations prohibit the exercise of such option as of the date of such sale or transfer. If Lender exercises this option, Lender shall give me notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which I must pay all sums secured by the Mortgage. If I fail to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Mortgage without further notice or demand on me.

H. That, as of the Modification Effective Date, I understand that the Lender will only allow the transfer and assumption of the Loan, including this Agreement, to a transferee of my property as permitted under the Garn St. Germain Act, 12 U.S.C. Section 1701j-3. A buyer or transferee of the Property will not be permitted, under any other circumstance, to assume the Loan. Except as noted herein, this Agreement may not be assigned to, or assumed by, a buyer or transferee of the Property.




I.      That, as of the Modification Effective Date, if any provision in the Note or in any addendum or amendment to the Note allowed for the assessment of a penalty for full or partial prepayment of the Note, such provision is null and void.

J.      That, I will cooperate fully with Lender in obtaining any title endorsement(s), or similar title insurance product(s), and/or subordination agreement(s) that are necessary or required by the Lender's procedures to ensure that the modified mortgage loan is in first lien position and/or is fully enforceable upon modification and that if, under any circumstance and notwithstanding anything else to the contrary in this Agreement, the Lender does not receive such title endorsement(s), title insurance product(s) and/or subordination agreement(s), then the terms of this Agreement will not become effective on the Modification Effective Date and the Agreement will be null and void.

K.      That I will execute such other documents as may be reasonably necessary to either (i) consummate the terms and conditions of this Agreement; or (ii) correct the terms and conditions of this Plan if an error is detected after execution of this Agreement. I understand that a corrected Agreement will be provided to me and this Agreement will be void and of no legal effect upon notice of such error. If I elect not to sign any such corrected Agreement, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by this Agreement, and I will not be eligible for a modification under the Home Affordable Modification program.

L.      Mortgage Electronic Registration Systems, Inc. ("MERS") is a separate corporation organized and existing under the laws of Delaware and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, (888) 679-MERS. In cases where the loan has been registered with MERS who has only legal title to the interests granted by the borrower in the mortgage and who is acting solely as nominee for Lender and Lender's successors and assigns, MERS has the right to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling the mortgage loan.

M.      That Lender will collect and record personal information, including, but not limited to, my name, address, telephone number, social security number, credit score, income, payment history, government monitoring information, and information about account balances and activity. In addition, I understand and consent to the disclosure of my personal information and the terms of the Trial Period Plan and this Modification Agreement by Lender to (a) the U.S. Department of the Treasury, (b) Fannie Mae and Freddie Mac in connection with their responsibilities under the Home Affordability and Stability Plan; (c) any investor, insurer, guarantor or servicer that owns, insures, guarantees or services my first lien or subordinate lien (if applicable) mortgage loan(s); (d) companies that perform support services for the Home Affordable Modification Program and the Second Lien Modification Program; and (e) any HUD certified housing counselor.

N.      I agree that if any document related to the Loan Documents and/or this Agreement is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the loan as modified, or is otherwise missing, I will comply with the Lender's request to execute, acknowledge, initial and deliver to the Lender any documentation the Lender deems necessary. If the original promissory note is replaced, the Lender hereby indemnifies me against any loss associated with a demand on the original note. All documents the Lender requests of me under this Section 4.N. shall be referred to as "Documents." I agree to deliver the Documents within ten (10) days after I receive the Lender's written request for such replacement.

O.      I understand that the mortgage insurance premiums on my loan may increase as a result of the capitalization which will result in a higher monthly payment. Furthermore, the date on which I may request cancelation of mortgage insurance may change as a result of the higher unpaid principal balance.




The Lender and I have executed this Agreement.

_____
Mortgage Electronic Registration Systems, Inc. -
Nominee for BAC Home Loans Servicing, LP

JAMIE SIMPSON

3/12/10
Date

By: _____

_____
Date

_____[Space Below This Line For Acknowledgement]

OFFICIAL SEAL
CHERYL A NAEDLER
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:11/06/11

Cheryl A. Naedler

5/18/2010




<u>EXHIBIT B</u>

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.
MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423

Prepared By:
TARA PASCH
COUNTRYWIDE HOME LOANS, INC.

2 MID AMERICA SUITE #450
OAKBROOK TERRACE
IL 60181

LAURIE MCPHILLIPS 16P  R 2006150971
Will County Recorder        Page 1 of 16

JAD Date 09/08/2006        Time 10:37:20
Recording Fees:                      36.75
IL Rental Hsng Support Prog:        10.00

**TICOR TITLE**

——————— [Space Above This Line For Recording Data] ———————

[Escrow/Closing #]                    [Doc ID #]

# MORTGAGE

MIN

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated   AUGUST 25, 2006   , together with all Riders to this document.

ILLINOIS - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS

Page 1 of 16

  -6A(IL) (0010).02    CHL (08/05)(d)   VMP Mortgage Solutions, Inc. (800)521-7291
CONV/VA

Form 3014 1/01




(B) "Borrower" is
AMIE SIMPSON

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under
this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address
and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(D) "Lender" is
COUNTRYWIDE HOME LOANS, INC.
Lender is a CORPORATION
organized and existing under the laws of NEW YORK
Lender's address is
4500 Park Granada MSN# SVB-314, Calabasas, CA 91302-1613
(E) "Note" means the promissory note signed by Borrower and dated AUGUST 25, 2006 . The
Note states that Borrower owes Lender
THREE HUNDRED EIGHT THOUSAND SEVEN HUNDRED FIFTY and 00/100

Dollars (U.S. $ 308,750.00 ) plus interest. Borrower has promised to pay this debt in regular
Periodic Payments and to pay the debt in full not later than SEPTEMBER 01, 2036 .
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider        ☐ Condominium Rider              ☐ Second Home Rider
☐ Balloon Rider                ☐ Planned Unit Development Rider ☐ 1-4 Family Rider
☐ VA Rider                     ☐ Biweekly Payment Rider         ☐ Other(s) [specify]

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners association
or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine
transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by
any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)

damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the

COUNTY             of              WILL
[Type of Recording Jurisdiction]              [Name of Recording Jurisdiction]

Redacted

Parcel ID Number:▮▮▮▮▮▮▮▮▮                    which currently has the address of

▮▮▮▮▮▮▮▮▮▮▮▮▮
[Street/City]

▮▮▮▮▮▮▮▮ ("Property Address"):
[Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including,

but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a

condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

· **17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged unless as otherwise provided under Applicable Law. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall

further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Waiver of Homestead.** In accordance with Illinois law, the Borrower hereby releases and waives all rights under and by virtue of the Illinois homestead exemption laws.

25. **Placement of Collateral Protection Insurance.** Unless Borrower provides Lender with evidence of the insurance coverage required by Borrower's agreement with Lender, Lender may purchase insurance at Borrower's expense to protect Lender's interests in Borrower's collateral. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by Borrower's and Lender's agreement. If Lender purchases insurance for the collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on its own.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.



_____ (Seal)
AMIE SIMPSON                -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower
Ralph H. Simpson, III  by Amie M. Simpson,
                           atty in fact

_____ (Seal)
                           -Borrower

STATE OF ILLINOIS,    Cohn, Jr.                    DOC ID # [redacted]
I, Alberto Cohn, Jr.                    Will    County ss:
and state do hereby certify that                    , a Notary Public in and for said county

_____ Aimee Simpson and Ralph H. Simpson, III
___ by Anne M. Simpson, atty in fact _____

_____

personally known to me to be the same person(s) whose name(s) subscribed to the foregoing instrument,
appeared before me this day in person, and acknowledged that he/she/they signed and delivered the said
instrument as his/her/their free and voluntary act, for the uses and purposes therein set forth.
    Given under my hand and official seal, this   25   day of   August   2006      .

My Commission Expires:

                                _____
                                Notary Public

        ╔═══════════════════════════════╗
        ║        "OFFICIAL SEAL"        ║
        ║      ALBERTO COLIN JR.        ║
        ║  Notary Public, State of Illinois  ║
        ║  My Commission Expires 4/21/10  ║
        ╚═══════════════════════════════╝

DET Date 06/21/2006    Time 16:03:20
Recording Fees:                    24.75
IL Rental Hsng Support Prog:    10.00

Recording requested by
Countrywide Home Loans, Inc.

~~When recorded mail to:~~
~~1800 Tapo Canyon Road~~
~~SV-79~~
~~Simi Valley, CA 93063~~
~~Attn: Document Control~~

WHEN RECORDED, MAIL AND RETURN TO:
HSBC
577 LAMONT ROAD
ELMHURST, IL 60126

_PIN_: ▆▆▆▆▆▆▆▆

### CORPORATION ASSIGNMENT OF MORTGAGE
Doc. ID# ▆▆▆▆▆▆
Commitment# ▆▆▆▆▆▆

For value received, the undersigned, Countrywide Home Loans, Inc., 1800
Tapo Canyon Road, Simi Valley, CA 93063, hereby grants, assigns and
transfers to:

    Household Finance Corporation III
    577 Lamont Rd., Elmhurst, IL 60126

All its interest under that certain Mortgage dated  8/03/05, executed by:
AMIE SIMPSON, Mortgagor as per MORTGAGE recorded as Instrument No.▆▆▆
▆▆▆ on  8-5-05  in Book ▆▆▆▆    Page ▆▆▆    of official
records in the County Recorder's Office of WILL County, ILLINOIS.
    Tax Parcel =▆▆▆▆▆▆,   WILL COUNTY TREASURER
Original Mortgage $60,000.00

(See page attached hereto for Legal Description)
Together with the Note or Notes therein described or referred to, the
money due and to become due thereon with interest, and all rights accrued
or to accrue under said Mortgage.

Dated: 08/17/2005    Countrywide Home Loans, Inc.

By _____
    Maribel Ledezma, Collateral Processong
    Officer-Treasury Bank, N.A. as attorney in fact for
    Countrywide Home Loans, INC.

State of California
County of Ventura

On 08/17/2005 before me, <u>Jose Juarez</u> , personally appeared Maribel Ledezma
, personally known to me (or proved to me on the basis of satisfactory
evidence) to be the person(s) whose name(s) is/are subscribed to the
within instrument and acknowledged to me that he/she/they executed the
same in his/her/their duly authorized capacity(ies), and that by
his/her/their signature(s) on the instrument the person(s), or the entity
upon behalf of which the persons acted, executed the instrument. Witness
my hand and official seal.

SEE ATTACHED LEGAL DESCRIPTION

Signature: _____
    Jose Juarez

Prepared by: Maribel Ledezma
1800 Tapo Canyon Road SV-20
Simi Valley, CA 93063
Phone#: (805) 577-6039

PREPARED BY
_Kimberly Niste_
577 LAMONT RD.
ELMHURST, IL 60126
630-817-7000

JOSE JUAREZ
COMM. #1473585
NOTARY PUBLIC · CALIFORNIA
VENTURA COUNTY
My Comm. Expires March 2, 2008

1 of 2

LEGAL DESCRIPTION

Redacted

WHEN RECORDED, MAIL AND RETURN TO:
HSBC
577 LAMONT ROAD
ELMHURST, IL 60126
Ln # ████████

ABOVE SPACE FOR RECORDER'S USE ONLY

## RELEASE OF MORTGAGE OR TRUST DEED BY CORPORATION

DOCID#▮▮▮▮▮▮▮▮▮▮

### KNOW ALL MEN BY THESE PRESENTS

That Mortgage Electronic Registration Systems, Inc. of the County of MARICOPA and State of ARIZONA , for and in consideration of one dollar, and for other good and valuable considerations, the receipt whereof is hereby acknowledged, do hereby remise, release, convey and quit-claim unto:

Name(s)...............:     AMIE SIMPSON

Property ............:     ▮▮▮▮▮▮▮▮▮▮            P.I.N.▮▮▮▮▮▮▮▮▮
Address..............:     ▮▮▮▮▮▮▮▮▮▮

heir, legal representatives and assigns, all the right, title interest, claim, or demand whatsoever it may have acquired in, through, or by a certain mortgage bearing the date  08/03/2005 and recorded in the Recorder's Office of  WILL county, in the State of Illinois in Book N/A of Official Records Page N/A as Document Number▮▮▮▮▮▮▮▮▮, to the premises therein described as situated in the County of WILL, State of Illinois, to wit together with all the appurtenances and privileges thereunto belong or appertaining.

WITNESS my hand this 30 day of August, 2006.

Mortgage Electronic Registration Systems, Inc.

Peter Lopez
Assistant Secretary

STATE OF ARIZONA

COUNTY OF MARICOPA

I, Ryan J. Riddell a notary public in and for the said County, in the state aforesaid, DO HEREBY CERTIFY that Peter Lopez, personally known to me (or proved to me on the basis of satisfactory evidence) to be the same person whose name subscribed to the foregoing instrument, appeared before me this day in person, and acknowledged that he signed, sealed and delivered the said instrument as a free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and official seal, this 30 day of August, 2006.



OFFICIAL SEAL
RYAN J. RIDDELL
NOTARY PUBLIC - ARIZONA
MARICOPA COUNTY
My Comm. Expires Nov. 13, 2009

Ryan J. Riddell, Notary public
Commission expires 11/13/2009

FOR THE PROTECTION OF THE OWNER, THIS RELEASE SHALL BE FILED WITH THE RECORDER OF DEEDS IN WHOSE OFFICE THE MORTGAGE OR DEED OF TRUST WAS FILED.

Mail Recorded Satisfaction To:               AMIE SIMPSON

Prepared By:    Steven W. Galiano
                ReconTrust Company, N.A.
                1330 W. Southern Ave.
                MS: TPSA-88
                Tempe, AZ 85282-4545
                (800) 540-2684

<u>EXHIBIT C</u>

# WELCOME TO SETERUS



Dear Homeowner,

Welcome to Seterus, Inc., your new mortgage servicing company. As one of the nation's leading loan servicing companies, we look forward to working with you to make paying for your home easier than ever.

We think you will be pleased with our many innovative customer service features, including 24-hour account access through our website, multiple payment options, and a toll-free customer service line with automated account information. Our goal is to provide a broad range of personalized touch points for you now that we are servicing your loan.

## HERE IS SOME IMPORTANT CONTACT INFORMATION YOU WILL WANT TO KEEP ON HAND:

| PAYMENT ADDRESS | WEBSITE | CUSTOMER SERVICE |
|---|---|---|
| PO BOX 7162<br>PASADENA, CA 91109-7162 | **www.seterus.com** | 866.570.5277 |

## VISIT OUR WEBSITE FOR MORE INFORMATION ABOUT THE TRANSFER OF YOUR LOAN.

Additionally, in this Welcome Packet you will find the following information and helpful documents:

- **Official Transfer of Servicing Notice**

- **Frequently Asked Questions Related to Your Loan**

- **How to Read Your Monthly Statement**

- **Auto Pay Authorization Agreement**

Remember, if you have questions or issues with your mortgage, we want to help you, if we can. If you fall behind on payments or think you might soon, please don't hesitate to contact us. We pride ourselves on being flexible and understanding in providing solutions. We look forward to working with you!



# seterus™

October 12, 2011



SIMPSON, AMIE

**Physical Address**
14523 SW Millikan Way, Suite 200; Beaverton, OR 97005

**Business Hours (Pacific Time)**
Mon-Thu 5:00am to 9:00pm; Fri 5:00am to 6:00pm
Sat 6:00am to 12:00pm; Sun 9:00am to 5:00pm

**Payments**
PO Box 7162; Pasadena, CA 91109-7162

**Correspondence**
PO Box 4121; Beaverton, OR 97076-4121

**Phone**
866.570.5277

**Fax**
866.578.5277

**Website**
www.seterus.com

Seterus, Inc. Loan No.:▆▆▆▆▆
Prior Servicer Loan No.: ▆▆▆▆▆▆▆

## Transfer of Servicing Notice

The servicing of your mortgage loan, that is the right to collect payments from you, is being transferred from Bank of America, N.A. to Seterus, Inc. effective October 01, 2011 (the "Transfer Date").

The assignment, sale or transfer of the servicing of the mortgage loan does not affect any term or condition of the mortgage instruments, other than terms directly related to the servicing of your loan.

Except in limited circumstances, the law requires that your present servicer send you this notice at least 15 days before the effective date of transfer, or at closing. Your new servicer must also send you this notice no later than 15 days after this effective date or at closing.

If you have any questions relating to the transfer of the servicing prior to the Transfer Date, call Bank of America, N.A. toll-free at 800.669.6607, Monday Monday-Friday 7 a.m. to p.m., local time. As of the Transfer Date, questions may be directed to Seterus, Inc. Customer Service toll-free at 866.570.5277. On the Transfer Date, Bank of America, N.A. will stop accepting payments from you. Seterus, Inc. will accept payments from you as of the Transfer Date. Send all payments due on or after that date to your new servicer.

As of the Transfer Date, any mortgage, life, disability, or any other type of optional insurance offered to you by your prior servicer was cancelled. If you wish to maintain the coverage, please contact the insurance carrier directly.

**Please note that this cancellation of optional insurance does not impact your existing hazard or homeowner's insurance coverage.**

You should be aware of the following information, which is set out in more detail in Section 6 of the Real Estate Settlement Procedures Act (RESPA). During the 60-day period following the effective date of the transfer of the loan servicing, a loan payment received by your old servicer before its due date may not be treated by Seterus, Inc. as late, and a late fee may not be imposed on you.

Section 6 of RESPA gives you certain consumer rights. If you send a "qualified written request" to Seterus, Inc.concerning the servicing of your loan, Seterus, Inc. must provide you with a written acknowledgement within 20 Business Days of receipt of your request. A "qualified written request" is a written correspondence, other than notice on a payment coupon or other payment medium supplied by Seterus, Inc., which includes your name and account number and your reasons for the request.

(Continued)

L025F

Not later than 60 Business Days after receiving your request, Seterus, Inc. must make any appropriate corrections to your account and must provide you with a written clarification regarding any dispute. During this 60-Business Day period, Seterus, Inc. may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request. However, this does not prevent Seterus, Inc. from initiating foreclosure if proper grounds exist under the mortgage documents.

A Business Day is a day on which the offices of Seterus, Inc. are open to the public for carrying on substantially all of its business functions.

Section 6 of RESPA also provides for damages and costs for individuals and classes of individuals in circumstances where servicers are shown to have violated the requirements of that Section. You should seek legal advice if you believe your rights have been violated.

Please know that if you are currently participating in, or being considered for a loss mitigation solution (Home Affordable Modification Program, forbearance agreement, short sale, refinance, or deed-in-lieu of foreclosure), we expect your documentation to be forwarded from Bank of America, N.A.. As of the Transfer Date, you should send your payments to us (e.g., trial period plan payments under Home Affordable Modification Program) until such time that we provide additional direction in writing. . We will notify you of your decision regarding qualification. Please note that this transfer may extend the time needed for a final decision.

Sincerely,

Seterus, Inc.

L025F

## IMPORTANT CONSUMER NOTICES

### YOUR RIGHTS UNDER THE FEDERAL FAIR DEBT COLLECTION PRACTICES ACT

If you do not notify us within 30 days after receiving this notice that you dispute the validity of this debt or any portion thereof, the debt will be assumed to be valid by the debt collector. If you notify us in writing within 30 days that the debt or any portion thereof is disputed, or if you request the name and address of the original creditor, we will obtain verification of the debt or judgment against you and mail a copy to you and provide you with the name and address of the original creditor.



If you notify us that you wish not to be contacted by telephone at your place of employment, we will not contact you there. If you notify us in writing that you refuse to pay the debt or that you wish us to cease further communication with you, we will not communicate with you except to advise you that our efforts are being terminated, that we may invoke specific remedies ordinarily invoked by collection agencies; and if, applicable, that we intend to take a specific remedy permitted by law.

THIS COMMUNICATION IS FROM A DEBT COLLECTOR AS WE SOMETIMES ACT AS A DEBT COLLECTOR. WE ARE ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE. HOWEVER, IF YOU ARE IN BANKRUPTCY OR RECEIVED A BANKRUPTCY DISCHARGE OF THIS DEBT, THIS LETTER IS NOT AN ATTEMPT TO COLLECT THE DEBT, BUT NOTICE OF POSSIBLE ENFORCEMENT OF OUR LIEN AGAINST THE COLLATERAL PROPERTY.

### FEDERAL FAIR CREDIT REPORTING ACT / The FACT ACT

We may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

### IMPORTANT NOTICE OF CONCERNING PRIVATE MORTGAGE INSURANCE

If your residential mortgage loan has private mortgage insurance (PMI), federal or state law may give you the right to cancel this insurance under some circumstances. Please contact our Customer Service Department for more information.

### STATE DISCLOSURES

Seterus, Inc. is located at 14523 SW Millikan Way, Beaverton, OR. Our address for payments, however, is specified on page one of this notice.

**CALIFORNIA:** The state Rosenthal Fair Debt Collection Practices Act and the federal Fair Debt Collection Practices Act require that, except under unusual circumstances, collectors may not contact you before 8 a.m. or after 9 p.m. They may not harass you by using threats of violence or arrest or by using obscene language. Collectors may not use false or misleading statements or call you at work if they know or have reason to know that you may not receive personal calls at work. For the most part, collectors may not tell another person, other than your attorney or spouse, about your debt. Collectors may contact another person to confirm your location or enforce a judgment. For more information about debt collection activities, you may contact the Federal Trade Commission at 877.FTC.HELP (877.382.4357) or www.ftc.gov.

**CALIFORNIA:** La Ley de Justa Recaudación de Deudas de Rosenthal estatal y la Ley de Justa Recaudación de Deudas federal requieren que, a excepción de circunstancias inusuales, los cobradores no pueden ponerse en contacto con usted antes de las 8 de la mañana ni después de las 9 de la noche. No pueden acosarle mediante el uso de amenazas de violencia o de arresto ni con el uso de palabras ofensivas. Los cobradores no pueden utilizar declaraciones falsas ni engañosas, así como tampoco pueden llamarle al trabajo si saben o tienen razón para saber que usted no puede recibir llamadas personales. En general, los cobradores no pueden informarle a otra persona, con la excepción de su abogado o cónyuge, sobre su deuda. Los cobradores pueden contactar a otra persona para confirmar su ubicación o hacer cumplir un fallo. Para obtener más información sobre las actividades de los cobradores de deudas, puede ponerse en contacto con la Comisión Federal de Comercio al 877.FTC.HELP (877.382.4357) o al sitio web www.ftc.gov.

(STATE DISCLOSURES CONTINUED ON THE BACK OF THIS PAGE)   I001F

# IMPORTANT CONSUMER NOTICES

## STATE DISCLOSURES, CONTINUED:

**COLORADO:** Colorado law requires we provide you with the following notice: A CONSUMER HAS THE RIGHT TO REQUEST IN WRITING THAT A DEBT COLLECTOR OR COLLECTION AGENCY CEASE FURTHER COMMUNICATION WITH THE CONSUMER. A WRITTEN REQUEST TO CEASE COMMUNICATION WILL NOT PROHIBIT THE DEBT COLLECTOR OR COLLECTION AGENCY FROM TAKING ANY OTHER ACTION AUTHORIZED BY LAW TO COLLECT THE DEBT. FOR INFORMATION ABOUT THE COLORADO FAIR DEBT COLLECTION PRACTICES ACT, SEE WWW.COLORADOATTORNEYGENERAL.GOV/CA. Seterus, Inc. maintains a local office at 355 Union Boulevard, Suite 302, Lakewood, CO 80228. The office's phone number is 888.738.5576.

**HAWAII:** Hawaii law requires we disclose to you that Seterus, Inc. is licensed in the State of Hawaii. Complaints regarding Seterus, Inc. can be directed to the Hawaii Commissioner of Financial Institutions by mail at PO Box 2054, Honolulu, HI 96805 or online at http://hawaii.gov/dcca/dfi/consumers_help/complaint/file-a-complaint.html and follow the instructions listed on the site.

**ILLINOIS:** The primary regulator for Seterus, Inc. is the Federal Trade Commission, Washington, DC 20580.

**MINNESOTA:** This collection agency is licensed by the Minnesota Department of Commerce.

**MONTANA:** Complaints regarding the servicing of your mortgage should be sent to the Division of Banking and Financial Institutions, by mail at PO Box 200546, Helena, MT 59620-0546, by phone at 406.841.2920 or by the on-line Website Complaint Form at http://banking.mt.gov/complaintform/Default.aspx.

**NEW YORK:** New York law requires we disclose to you that Seterus, Inc. is licensed in the State of New York. Complaints regarding Seterus, Inc. can be directed to the New York State Banking Department. You may obtain further information from the New York State Banking Department by calling the Department's Consumer Help Unit at 877.BANK.NYS (877.226.5697) or by visiting the Department's website at www.banking.state.ny.us. If you have questions, please contact Seterus, Inc. Customer Service toll-free at 866.570.5277, or in writing at PO Box 4121, Beaverton, OR 97076-4121.

**NEW YORK CITY:** 1331537, 1340663, 1340148.

**NORTH CAROLINA:** North Carolina law requires we disclose to you that Seterus, Inc. is licensed in the State of North Carolina. Complaints regarding Seterus, Inc. can be directed to the North Carolina Commissioner of Banks by phone at 919.733.3016 or online at http://www.nccob.org/NCCOB and following instructions listed at the site.

**TENNESSEE:** This collection agency is licensed by the Collection Service Board, State Department of Commerce and Insurance.

**TEXAS:** COMPLAINTS REGARDING THE SERVICING OF YOUR MORTGAGE SHOULD BE SENT TO THE DEPARTMENT OF SAVINGS AND MORTGAGE LENDING, 2601 N LAMAR, SUITE 201, AUSTIN, TX 78705. A TOLL-FREE CONSUMER HOTLINE IS AVAILABLE AT 877.276.5550.

**UTAH:** As required by Utah law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit-reporting agency if you fail to fulfill the terms of your credit obligations.

**WISCONSIN:** This collection agency is licensed by the Administrator of the Division of Banking, PO Box 7876, Madison, WI 53707.

# seterus ™

October 12, 2011



RE:  Seterus, Inc. Loan No.: ▆▆▆▆▆
     Prior Servicer Loan No.: ▆▆▆▆▆
     Property: ▆▆▆▆▆
▆▆▆▆▆



### Payment Schedule Letter

Seterus, Inc. is the servicer of the above-referenced loan, which transferred from Bank of America, N.A. on October 1, 2011.

Below is your payment schedule for the next three months:

| Next Due Date | Total Payment Amount* | Mail Payments to: |
|---|---|---|
| 11/01/2011 | $2203.75 | Seterus, Inc.<br>PO Box 7162<br>Pasadena, CA 91109-7162 |
| 12/01/2011 | $2203.75 | Seterus, Inc.<br>PO Box 7162<br>Pasadena, CA 91109-7162 |
| 01/01/2012 | $2203.75 | Seterus, Inc.<br>PO Box 7162<br>Pasadena, CA 91109-7162 |

*In the following circumstances we are unable to predict precise amounts and your payment may be different:
1. If you do not see a Total Payment Amount in the schedule, you have an adjustable rate mortgage and will need to refer to the federal change notice that will be sent under separate cover.
2. If Seterus, Inc. completes an escrow analysis on your loan, a notice will be sent to you notifying you of the payment change.
3. Your payment amount may vary due to a Bankruptcy plan, loan modification, or stipulation agreement.
4. If your loan has been accelerated, this payment schedule may not apply as your loan is already due in full.
5. If your loan is delinquent, further payments in addition to those listed in the payment schedule may be due.

We are regulated by the Federal Trade Commission, who are located at 600 Pennsylvania Avenue NW, Washington, DC 20580.

If you have any questions, please contact us at 866.570.5277.

Sincerely,

Seterus, Inc.

I016D

# seterus™





SIMPSON, AMIE

*This temporary mortgage coupon may be used for your first payment to Seterus, Inc. A remittance envelope is also enclosed.*
*If you have both a first and second mortgage, please send only the payment required for the loan identified in this letter.*

Seterus, Inc.
SIMPSON, AMIE

Seterus, Inc. Loan No.: ▮▮▮▮▮▮
*Total Amount Enclosed*

Seterus, Inc.
PO Box 7162
Pasadena, CA 91109-7162

$ |

EXHIBIT D

# Amie M. Simpson



Sunday, October 23, 2011

SENT VIA FAX to SETERUS (877-371-7799)

Re: ·Account No.▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓

To whom it may concern:

I spoke with Jessica Davis, your representative, via telephone on Friday, October 21, 2011, and she advised me to send this letter. Ms. Davis advised me that Seterus' records show that my account is delinquent. This is not in fact the case, and Ms. Davis assured me that by writing this letter, I am authorizing Seterus to contact Bank of America and obtain all information related to my previous payments. Such information will show that Bank of America made various errors in processing my payments over the last two years, and that my account is in fact not delinquent. Bank of America should therefore release my most recent payment, made ·September 30, 2011, to Seterus, at which time my account with Seterus should be up to date.

Ms. Davis suggested I give a brief summary of the history of my account with Bank of America. I can provide Seterus with additional specific documentation as requested. The important thing to note, however, is that **at no time have I missed a payment or made a late payment in the history of my mortgage on this property.**

In February of 2009, my husband lost his job as a union sprinklerfitter. His income was effectively cut in half. As a result, we initially used savings and other means to continue to make our mortgage payments. We did so on time, every month. Then, we began to inquire about modifying our loan. We applied for a modification in the summer of 2009, but at that time there was apparently much confusion among the Bank of America representatives about the modification process. We continued to pursue a modification, and were eventually approved in late 2009. At that time, we received a trial modification and were instructed about when modification payments were due. I actually made one trial modification payment early, but the rest were made on the dates specified. After some time, we were approved for a permanent modification, to be effective May of 2010. I made my first modification payment on 4/29/2011, as I understood my payment was due May 1. (I will need to check the documentation at my

office to ensure these dates are correct.) That, apparently created the problem that continues to date.

I began receiving notices that my payments were past due, despite the fact that I had made timely payments each and every month. As a result of my "past due" status, I could not make payments in any other way than by telephone, which resulted in enormous inconvenience each month, because BA's telephone wait times were so long. On 10/1/2010, when I made a monthly payment, I spoke with BA representative Trent Eban. He informed me that there had been an error in processing one of my payments, and that he would have a supervisor contact me. I did not hear from anyone. On 11/1/2010, I made my payment and the representative I spoke with at that time assured me that they were working on the issue and that someone would call me. No one ever did. On 12/1/2010, I spoke with BA representative Jessica when I made my payment. She said she would research the issue and get back with me. She did in fact send me an email confirming that what had happened was that my 4/29/2010 payment had been applied to my old loan (pre-modification) which was in error. She forwarded me the email which she sent to her supervisor on the issue, and asked that I be included in any follow up. I received no response. I continued to make my monthly payments on time, each month, either via telephone or at BA branches. On 3/1/2011, during the process of making one of my payments, I spoke to a Jamie Jackson in the BA modifications department. I was told that the error was being fixed, and the process would take 7 to 10 days. I never heard back. When I made my May 1, 2011 payment, another representative read over my notes and told me that a number of people were having the same problem, and that BA was very backed up trying to fix it all. I asked her if I needed to take any action. She told me that I should just wait and be patient.

Since that time, as throughout the course of my loan, I have made my payments EVERY month, ON TIME. When I made my payment for October, I was not aware that my loan had been transferred to Seterus. I made my payment via telephone on September 30, 2011, at 4:16 p.m. At that time, the BA phone representative confirmed that my payment would be effective as of that date. The payment did not actually post to my account until October 3, 2011. Ms. Davis, your representative, informed me that BA has not passed that payment on to Seterus. She also informed me that I had accrued late fees from May 2011 to September 2011 on my BA account. Again, I have never made ANY late payments, and I have always been assured by the BA reps with whom I have made my payments that the payments were being applied to my mortgage, and that they were trying to fix the underlying problem with my account.

I am relieved that Seterus will be looking into this issue, and I am also relieved to no longer be working with Bank of America. It is my hope that this problem can be resolved quickly, so that I can continue to make my mortgage payments in a timely fashion to Seterus without receiving collection calls like the one from Ms. Davis on Friday. I will be happy to supply Seterus representatives with any and all documentation necessary. I may be reached via

email at ██████████████ or by phone on my cell at ████████ I look forward to enjoying a good working relationship with Seterus. Until I am told otherwise, I will make my payments via mail with the coupon book provided in my Seterus packet. If this is not the correct approach, please notify me as soon as possible. Again, thank you for any and all assistance you are able to provide in this matter.

Sincerely,

Amie M. Simpson
Attorney at Law

EXHIBIT E



# seterus™

**Physical Address**
14523 SW Millikan Way; Suite 200; Beaverton, OR 97005

**Business Hours (Pacific Time)**
Mon-Thu 5:00am to 9:00pm; Fri 5:00am to 6:00pm
Sat 6:00am to 12:00pm; Sun 9:00am to 5:00pm

**Payments**
PO Box 7162; Pasadena, CA 91109-7162

**Correspondence**
PO Box 4121; Beaverton, OR 97076-4121

**Phone**
866.570.5277

**Fax**
866.578.5277

**Website**
www.seterus.com

November 6, 2011

SIMPSON, AMIE
███████████████████
███████████████████

RE: Loan No.:█████████

Seterus, Inc. is the servicer of the above-referenced loan.

We are writing regarding your request to research a payment(s). Our research has resulted in the following:

| Check Number or Wire | Date | Amount | Resolution |
|---|---|---|---|
| N/A | 9/30/2011 | $2,203.75 | The funds were posted to the loan by your prior servicer before the loan was transferred to Seterus. |

If you have any questions, please contact us at our toll-free number above.

Sincerely,

Seterus, Inc.

THIS COMMUNICATION IS FROM A DEBT COLLECTOR AS WE SOMETIMES ACT AS A DEBT COLLECTOR. WE ARE ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE. HOWEVER, IF YOU ARE IN BANKRUPTCY OR RECEIVED A BANKRUPTCY DISCHARGE OF THIS DEBT, THIS LETTER IS NOT AN ATTEMPT TO COLLECT THE DEBT, BUT NOTICE OF POSSIBLE ENFORCEMENT OF OUR LIEN AGAINST THE COLLATERAL PROPERTY. COLORADO: FOR INFORMATION ABOUT THE COLORADO FAIR DEBT COLLECTION PRACTICES ACT, SEE WWW.COLORADOATTORNEYGENERAL.GOV/CA. Seterus, Inc. maintains a local office at 355 Union Boulevard, Suite 302, Lakewood, CO 80228. The office's phone number is 888.738.5576. NEW YORK CITY: 1331537, 1340663, 1340148. TENNESSEE: This collection agency is licensed by the Collection Service Board of the Department of Commerce and Insurance. Seterus, Inc. is licensed to do business at 14523 SW Millikan Way, Beaverton, OR.

EXHIBIT F



**Physical Address**
14523 SW Millikan Way, Suite 200; Beaverton, OR 97005

**Business Hours (Pacific Time)**
Mon-Thu 5:00am to 9:00pm; Fri 5:00am to 6:00pm
Sat 6:00am to 12:00pm; Sun 9:00am to 5:00pm

**Payments**
PO Box 7162; Pasadena, CA 91109-7162

**Correspondence**
PO Box 4121; Beaverton, OR 97076-4121

**Phone**
866.570.5277

**Fax**
866.578.5277

**Website**
www.seterus.com

November 15, 2011

Amie Simpson

RE: Loan No.:

Dear Ms. Simpson:

On behalf of Seterus, Inc., I am responding to your correspondence received October 25, 2011 regarding the above-referenced loan.

Records from your prior servicer, Bank of America, reflect that funds received on April 30, 2010 in the amount of $2,654.38 were credited to your suspense account. After loan adjustments were made during the implementation of your loan modification on June 9, 2010, your loan was due for the May 1, 2010 installment.

Records from Bank of America also reflect that they declined to reverse any payments that were received prior to the implementation of your loan modification and credited to your loan during the implementation on June 9, 2010. While you may have thought that the funds would be applied to a future loan installment, any funds received prior to implementation of the modification terms were eligible for credit toward the delinquent balance of the loan.

The only way to re-apply these funds would be to cancel the modification. We respectfully decline to do this, as such action would cause the account to become seriously delinquent and eligible for Foreclosure action.

Your payment history with Bank of America reflects that funds received by them on September 30, 2011 in the amount of $2,203.75 were credited to satisfy the September 1, 2011 installment. Your loan transferred to us on October 1, 2011 due for the October 1, 2011 installment. We received funds in the amount of $2,203.75 on November 1, 2011 and these funds were credited to satisfy the October 1, 2011 installment. As of the date of this letter, your loan is due for the November 1, 2011 installment in the amount of 2,203.75.

If you have any questions, please contact us at our toll-free number above.

Sincerely,

Christine Eshelman
Correspondence Response Team
Seterus, Inc.

THIS COMMUNICATION IS FROM A DEBT COLLECTOR AS WE SOMETIMES ACT AS A DEBT COLLECTOR. WE ARE ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE. HOWEVER, IF YOU ARE IN BANKRUPTCY OR RECEIVED A BANKRUPTCY DISCHARGE OF THIS DEBT, THIS LETTER IS NOT AN ATTEMPT TO COLLECT THE DEBT, BUT NOTICE OF POSSIBLE ENFORCEMENT OF OUR LIEN AGAINST THE COLLATERAL PROPERTY. COLORADO: FOR INFORMATION ABOUT THE COLORADO FAIR DEBT COLLECTION PRACTICES ACT, SEE WWW.COLORADOATTORNEYGENERAL.GOV/CA. Seterus, Inc. maintains a local office at 355 Union Boulevard, Suite 302, Lakewood, CO 80228. The office's phone number is 888.738.5576. NEW YORK CITY: 1331537, 1340663, 1340148. TENNESSEE: This collection agency is licensed by the Collection Service Board of the Department of Commerce and Insurance. Seterus, Inc. is licensed to do business at 14523 SW Millikan Way, Beaverton, OR.

EXHIBIT G

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA, *ex rel.*
[UNDER SEAL],

                              Plaintiff,

        v.

[UNDER SEAL],

                              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

No.

COMPLAINT FOR VIOLATIONS OF
THE FALSE CLAIMS ACT

Filed Under Seal Pursuant to
31 U.S.C. § 3730(b)(2)

**[FILED IN CAMERA AND UNDER SEAL]**

# ORIGINAL

006183-11 457264 V1

Shayne C. Stevenson (*pro hac vice pending*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
Telephone: (206) 268-9340
Facsimile: (206) 623-0594

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA, *ex rel.*
GREGORY MACKLER,

                              Plaintiff,

            v.

BANK OF AMERICA, N.A. and BAC HOME
LOANS SERVICING, LP,

                              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

No.

COMPLAINT FOR VIOLATIONS OF
THE FALSE CLAIMS ACT

Filed Under Seal Pursuant to
31 U.S.C. § 3730(b)(2)

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ..................................................................................................1

II.    JURISDICTION AND VENUE .........................................................................4

III.    PARTIES ............................................................................................................5

IV.    BACKGROUND ................................................................................................5

    A.    The Taxpayer Bailout of Bank of America......................................................5

    B.    The Home Affordable Modification Program (HAMP) ..........................................7

        1.    HAMP Eligibility Requirements.................................................................8

    C.    Treasury's HAMP Servicer Participation Agreement with Bank of America.......11

        1.    The Agreement..............................................................................11

            a.    The Financial Instrument .............................................................13

            b.    The Annual Certification .............................................................14

            c.    Treasury's Supplemental Directives and Handbook.....................15

        2.    Bank of America and other servicers' performance .................................19

V.    ALLEGATIONS...............................................................................................20

    A.    Bank of America Violates its Agreement with Treasury by Fraudulently Handling Homeowner HAMP Submissions, Inquiries and Complaints...............20

        1.    BoA outsources HAMP work to Urban Lending Solutions.....................22

        2.    Relator witnesses and challenges systemic HAMP fraud.........................24

            a.    Relator begins as a "customer advocate" for BoA.........................26

            b.    Relator becomes a subject matter expert .......................................31

            c.    Relator is hired as a QC ................................................................36

            d.    Relator begins work on the "Root Cause" project.........................41

            e.    Root Cause project is dissolved and Relator is terminated............50

    B.    Bank of America Violates the False Claims Act ..................................................50

VI.    CONCLUSION.................................................................................................53

## I.   INTRODUCTION

1.      Plaintiff and Relator Gregory P. Mackler, on behalf of the United States, brings
this *qui tam* action to recover treble damages and civil penalties under the False Claims Act, 31
U.S.C. § 3729 *et seq.*, arising from false and fraudulent records, and false statements material to
false and fraudulent claims, made, used and caused to be made, used and presented by
defendants Bank of America, N.A. and its subsidiary BAC Home Loans Servicing, LP
(collectively "BoA"), to the United States Government under the Home Affordable Modification
Program ("HAMP").

2.      In late 2008 and early 2009, the United States Government provided a total of $45
billion to Bank of America pursuant to the Troubled Asset Relief Program ("TARP"). It also
extended to BoA an additional guarantee of over $100 billion. Having concluded that the costs
of allowing BoA to fail were too high, the Government decided that taxpayers would save the
life of this Bank, and they did.

3.      Because the stated purpose of the financial bailout was to help the American
people, and homeowners in particular, HAMP was implemented in March of 2009 to assist the
millions of American homeowners facing foreclosure.

4.      Knowing all eyes were upon it, and the billions of dollars it had been given by the
Government, Bank of America (the nation's largest mortgage servicer), on April 17, 2009,
signed a "Servicer Participation Agreement" (the "Agreement") with Treasury (through its agent
Fannie Mae) requiring it to, *inter alia*, use "reasonable efforts" to "effectuate any modification of
a mortgage loan under the [HAMP]."

5.      This consideration owed the Government by BoA was in exchange for a
commitment by the Government to provide BoA potentially hundreds of millions of taxpayer
dollars for its promise and obligation to comprehensively provide HAMP screening for all
homeowners serviced by BoA, to extend HAMP Trial Period Plan offers to all such eligible

- 1 -

homeowners, and to extend permanent HAMP modifications to all eligible homeowners whose mortgages it services.[1]

6.     Knowing that every successful HAMP modification for a homeowner would negatively impact its bottom line, BoA never entered into the Agreement in good faith. Though mindful it needed to permit some number of HAMP modifications to avoid Government action against it, BoA developed an elaborate scheme to force down the number of successful HAMP modifications. It has done so by deliberately and unlawfully denying scores of otherwise qualified homeowners the ability to successfully qualify for HAMP modifications, while lying to those homeowners persistent enough to escalate complaints and to the regulatory bodies inquiring on behalf of homeowners.

7.     BoA concluded that it was far more lucrative to deliberately force otherwise qualified homeowners *outside* of HAMP so that it could either profit from foreclosure proceedings, force the homeowner into a more costly proprietary mortgage "modification" than HAMP would permit, or otherwise profit from continuing to service the defaulting and defaulted mortgages.

8.     As Relator Mackler directly and independently observed, Bank of America has accomplished this fraud since the inception of HAMP, in knowing violation of the Agreement and express terms of the HAMP "Program Documentation" incorporated therein, through a variety of mechanisms, including the following: (a) developing and maintaining a fraudulently concealed document image repository of homeowner HAMP documentation so that BoA or its agents could falsely deny receiving homeowner documents or claim incompleteness even after satisfactory receipt of them; (b) deliberately deceiving homeowners who complain about BoA's handling of their HAMP inquiries and submissions, with efforts to keep them from HAMP eligibility; (c) intentionally forcing homeowners to wait months before a response to HAMP

---

[1] United States Department of Treasury, *Troubled Asset Relief Program Transactions Report for Period Ending March 8, 2011*, March 8, 2011 at 27. Available at http://www.treasury.gov/initiatives/financial-stability/briefing-room/reports/tarp-transactions/DocumentsTARPTransactions/3-10-11%20Transactions%20Report%20as%20of%203-8-11.pdf ("Treasury Transaction Report").

eligibility determinations (such delay resulting in HAMP "ineligibility") and failing, by design, to communicate HAMP concerns to homeowners, including deadlines, purportedly incomplete records, modification status, risk of losing eligible status, or other eligibility concerns; (d) unlawfully proceeding with foreclosure actions (under "dual track" protocols) while homeowners are reviewed for HAMP eligibility or during a payment period; (e) failing to properly credit homeowner HAMP payments during the Trial Period, resulting in improper denials of permanent HAMP modifications and other improper costs to homeowners; (f) failing to properly "waterfall" homeowners under HAMP requirements, including by pushing proprietary modifications on homeowners as a predatory foist; (g) failing to properly convert eligible HAMP homeowners from Trial Period status to permanent modification status; (h) failing to properly and in good faith evaluate homeowners for HAMP, including failing, by design, to develop and maintain a proper quality control operation as required by the Agreement; and (i) failing to give actual authority to BoA employees and contractors to properly resolve escalated complaints. Each of these practices violates BoA's Agreement, the binding terms of participation and conditions for federal Government payments under HAMP.

9.      These mechanisms of fraud were and are interconnected and directly observed by Relator Mackler, who worked with various BoA executives while at Urban Lending Solutions ("Urban") beginning in April of 2010. BoA outsources various HAMP obligations to Urban.[2] Upon witnessing the unlawful, fraudulent practices listed above, among others, Mackler brought his concerns to the highest levels of Urban and to executives at Bank of America. Eventually, his objections to these practices led to his termination on March 17, 2011.

10.     Because a condition of payment under the terms of the Agreement was and is the requirement that Bank of America service HAMP modification submissions, inquiries and homeowner complaints in good faith, in an effort to assist homeowners in their HAMP modification efforts, BoA's intentional and deliberate efforts to fraudulently operate its HAMP

---

[2] HAMP is the centerpiece of various homeowner assistance efforts under the umbrella Making Home Affordable ("MHA") program. BoA and Urban typically refer to MHA rather than HAMP, though the latter is the most important component of the former.

- 3 -

program renders it ineligible for federal payments and obligated to return the payments it has improperly received and concealed since it signed its Agreement with Treasury in April 2009.[3]

11.     *Qui tam* Relator Mackler seeks through this action to recover damages and civil penalties arising from Defendants' making or causing to be made false or fraudulent records, statements and claims in connection with Defendants knowing and material breach of its Agreement with the Department of Treasury and its unlawful violation of the False Claims Act. Defendants knew and continue to know that their false and fraudulent HAMP modification program has caused the submission of false claims not eligible for Government payment.

## II.     JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. Plaintiff-Relator establishes subject matter jurisdiction under 28 U.S.C. § 3730(b).

13.     Under 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint with respect to which Relator Mackler is not an "original source," and all material information relevant to his allegations was provided to the United States Government prior to filing his Complaint, in satisfaction of 31 U.S.C. § 3730(e)(4)(B).

14.     This Court has personal jurisdiction over the Defendants and is a proper venue pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a) because those sections authorize nationwide service of process and because the Defendants have minimum contacts with the United States. Moreover, the Defendants can be found in, reside, transact, or have transacted business in the Eastern District of New York. At all times relevant, Defendants regularly

---

[3] Martin, Andrew, "Big Banks Penalized for Performance in Mortgage Modification Program," New York Times (on-line), June 9, 2011, available at http://www.nytimes.com/2011/06/10/business/10hamp.html?_r=1 (reporting on the Treasury Department's announcement June 9, 2011, that it would withhold incentive payments to Bank of America under HAMP based upon BoA's poor performance).

conducted substantial business within and made significant revenue within the Eastern District of New York.

### III.    PARTIES

15.    Plaintiff-Relator Gregory Mackler is a resident of Longmont, Colorado. From April 30, 2010, when he began work at Urban as a temporary contractor, through July 26, 2010, when he became a full-time employee, and until March 17, 2011, when he was unlawfully terminated, Mackler witnessed firsthand the fraud that is alleged in this Complaint and is the original source of this information.

16.    Defendant Bank of America, N.A. is a Delaware corporation, with its principal offices located at 101 S. Tryon Street, in Charlotte, North Carolina.

17.    Defendant BAC Home Loans Servicing, LP is a subsidiary of Bank of America, N.A., located at 4500 Park Granada, in Calabasas, California.

### IV.    BACKGROUND

#### A.    The Taxpayer Bailout of Bank of America

18.    In the fall of 2008 the United States Government responded to a serious crisis in financial market conditions. Bear Stearns and Lehman Brothers folded. Unemployment rose to 6.2 percent by September, the same month that the Treasury Department took Fannie Mae and Freddie Mac into conservatorship, the Federal Reserve began an $85 billion taxpayer-funded rescue of American International Group, FDIC took Washington Mutual (the nation's largest savings and loan bank) into receivership, and the S&P 500 index lost another 10% of its already declining value. The biggest player in the then-worsening housing market crash, Countrywide Financial Corp., was bought out by Bank of America (now a costly albatross for the Bank). The housing market crash itself gave rise to the specter of millions of Americans on a path to losing their homes, and rising mortgage payment delinquencies.

19.    The Government responded to this crisis on October 3, 2008, with passage of the Emergency Economic Stabilization Act of 2008 ("ESSA"), which created (among other things) the Troubled Asset Relief Program. ESSA, through the establishment of TARP, granted the

Treasury Department unprecedented authority to spend billions of dollars to "restore liquidity and stability to the financial system of the United States." The Final Report of the TARP Congressional Oversight Panel estimates the program will ultimately cost taxpayers $25 billion.[4]

20.     As the Panel put it, "almost overnight" U.S. taxpayers, via TARP, provided to several large financial institutions an infusion of over $200 billion. This massive bailout was the *but for* cause of the continued existence of several institutions including Bank of America.

21.     On October 28, 2008, BoA received $15 billion in taxpayer funds through TARP in a Government purchase of its preferred stock.[5]

22.     In December of that year the Treasury used taxpayer funds to purchase an additional $20 billion of BoA's preferred shares through a unique Targeted Investment Program made available only to BoA and Citigroup.[6]

23.     In January of 2009, Treasury announced that through the Asset Guarantee Program (like TARP, a program created with the passage of ESSA) the Government would offer an additional guarantee against losses of $118 billion to BoA. This contract was never finalized, but helped BoA assure investors and the broader market that it could absorb unexpected losses.[7]

24.     That same month, on January 9, 2009, TARP provided another $10 billion to BoA through an additional purchase of its preferred stock.[8]

25.     According to the Panel's Final Report, the total federal Government exposure for BoA topped $336 billion in 2009, second only to Citigroup and well more than twice the

---

[4] Congressional Oversight Panel, *The Final Report of the Congressional Oversight Panel*, March 16, 2011 at 9. Originally available at http://cop.senate.gov/reports/library/report-100909-cop.cfm, now available at http://cybercemetery.unt.edu/archive/cop/20110401223133/http://cop.senate.gov/reports/library/report-031611-cop.cfm ("Final Report").

[5] Treasury Transaction Report at 1.

[6] Final Report at 23.

[7] Final Report at 24.

[8] Treasury Transaction Report at 4.

exposure to any other institution.[9]  These mammoth investments and exposures of taxpayer

dollars to BoA unquestionably prevented its collapse and allowed the bank to return to profit.

## B.    The Home Affordable Modification Program (HAMP)

26.    The U.S. housing market reached a new apex earlier this decade and then began a

precipitous slide in 2006.  In the months and years that followed, millions of Americans have

faced the sudden and unprecedented prospect of foreclosure.

27.    It is generally agreed that policymakers overestimated the extent to which natural

market forces, through private modification efforts, would address the growing numbers of

foreclosures and delinquencies.[10]  For this reason, the broader economic risks associated with a

deluge of non-performing mortgages were only just beginning to be realized in 2006.

28.    In 2007 and 2008, the federal Government made efforts to combat the foreclosure

problem, with the FHA Secure foreclosure mitigation program, HOPE for Homeowners, and an

FDIC IndyMac loan modification program, but none of these programs sufficiently addressed the

crisis and the problem continued to worsen.[11]

29.    In furtherance of the foreclosure prevention mandate articulated by Congress in

the ESSA, and with the stated goal of preventing three to four million foreclosures, the Treasury

Department rolled out the Home Affordable Modification Program in March of 2009:

> HAMP is designed to provide a path to modifying mortgages and
> provides subsidies to lenders, servicers, and homeowners to
> encourage such modifications.  Once approved for assistance
> through HAMP, a borrower must successfully complete a trial
> period, typically three months, during which the borrower makes
> payments on the modified mortgage.  A borrower who remains
> current through the trial period becomes eligible for a permanent
> modification, under which the terms of the trial period remain in
> effect for a period of five years.  After the five-year term is up, the
> interest rate on the loan can increase by a maximum of 1 percent

---

[9] Final Report at 36.

[10] Congressional Oversight Panel, *A Review of Treasury's Foreclosure Prevention Programs*,
December 14, 2010 at 13 ("December Report").  Originally available at
http://cop.senate.gov/reports/library/report-121410-cop.cfm, now available at
http://cybercemetery.unt.edu/archive/cop/20110401232915/.

[11] December Report at 10-13.

per year until it reaches the prevailing Freddie Mac average interest rate at the time the HAMP modification was made.[12]

30.    HAMP was initially given $50 billion in federal funding.[13] With those funds, Treasury has provided financial incentives for mortgage servicers to assist homeowners in keeping their homes by way of HAMP modifications. HAMP was implemented with clear intent that institutions like Bank of America and other TARP recipients would need to participate in the program, even for non-government-sponsored-enterprise portfolios.

### 1.    HAMP Eligibility Requirements

31.    Once a mortgage servicer, such as BoA, signs the Servicer Participation Agreement it is obligated to determine who among the homeowners whose mortgages it services may be eligible for HAMP, and to extend the opportunity for all homeowners to apply for, and, if qualified, to participate in HAMP. The servicer must identify eligible homeowners and assist in their efforts to secure HAMP modification of their loans. Servicers such as BoA are obligated to identify those loans subject to modification both through self-initiated investigation of their mortgage service portfolios,[14] and in response to inquiries and modification requests from individual homeowners or regulators acting on their behalf.[15]

32.    As discussed below, the HAMP requirements for servicers are set forth in the Servicer Participation Agreement and the Program Documentation incorporated by and into that Agreement. A series of Treasury Department Supplemental Directives are part of that Program Documentation, as well as a regularly updated Handbook provided by the Treasury Department through Fannie Mae. Each of these documents places strict compliance requirements on servicers under the terms of their respective Agreements with Treasury.

---

[12] Final Report at 91 n.286.

[13] December Report at 16 n.23.

[14] Making Home Affordable Program "Handbook for Servicers of Non-GSE Mortgages," Version 3.0, effective December 2, 2010 at 47 ("Handbook"). A new Version 3.1 of the Handbook was issued on May 2, 2011 and is available at https://www.hmpadmin.com/portal/programs/servicer.jsp.

[15] December Report at 14.

33.     Where a servicer identifies a qualified homeowner, the lender must reduce that homeowner's monthly payments until they amount to no more than 38% of his or her gross monthly income (*i.e.*, a mortgage debt-to-income ratio of 38%). The Treasury Department then matches dollar for dollar any further reductions necessary to bring the monthly payments down to 31%.[16] Treasury also provides an up-front payment to servicers for each eligible homeowner who enters a permanent modification. That amount is subject to annual supplementation by Treasury under certain conditions for each eligible borrower being serviced.

34.     In addition to more specific requirements set forth in further Supplemental Directives and the Treasury Handbook, in order to qualify under HAMP a homeowner[17] must satisfy these basic requirements:

    a.  The home must be owner-occupied, not vacant or condemned;

    b.  The remaining balance on a single-unit home cannot exceed $729,750;

    c.  The borrower must actually be delinquent, or default must be reasonably foreseeable, and able to demonstrate financial hardship, including that the borrower has insufficient liquid assets to make the now-required monthly payments; and

    d.  The borrower must have a monthly "front-end" debt-to-income ratio of more than 31% (*i.e.*, the borrower's monthly mortgage payment must be greater than 31% of the borrower's gross monthly income).[18]

---

[16] December Report at 14.

[17] MHA and HAMP documents can refer to "homeowners" or "borrowers" or "customers." For purposes of this complaint, the terms are interchangeable.

[18] U.S. Department of Treasury, *Introduction of the Home Affordable Modification Program*, Supplemental Directive 09-01, at 6, April 6, 2009. Available at www.hmpadmin.com/portal/programs/docs/hamp-servicer/sd0901.pdf.

"Monthly payment" refers not only to the mortgage payment itself, but also applicable taxes, hazard and flood insurance, and homeowner association fees. "Front-end" refers to the ratio of monthly mortgage payment to monthly income. By contrast, a "back-end" debt-to-income ratio compares *all* debt service payments made by the borrower (*e.g.*, car payments, credit card payments) to income. Until June 2010, verification of borrower income was not required for HAMP eligibility.

-9-

35.     If each requirement is satisfied, BoA and other servicers must then apply the Treasury's Net Present Value ("NPV") algorithm to the homeowner's situation. This model determines the NPV of the expected income from the mortgage under a modification and compares it with the NPV anticipated with no modification (typically foreclosure or sale at a loss). If the value of the mortgage is greater with modification, the mortgage is "NPV positive" and the servicer is required to offer a HAMP modification.[19]

36.     The next step required of servicers under HAMP is the mandatory "waterfall" analysis to determine what specific type of modification must be applied given the homeowner's situation. First, the servicer must decide whether lowering the interest rate would drive the monthly front-end debt-to-income ratio under 31%. If not, step two requires analysis whether extending the period of the loan (even up to 40 years) would suffice to drive the number below 31%. Finally, if the debt-to-income ratio under both scenarios still exceeds 31%, principal forbearance is required. Only after full consideration and proper rejection of a homeowner for HAMP may a servicer consider extending a proprietary modification offer.

37.     Once approved for HAMP modification, a homeowner who agrees to participate typically begins a three-month Trial Period during which mortgage payments are made under the terms of the modification. If timely payments are made during those three months (i.e., not more than 30 days overdue during any month), the homeowner must be offered a permanent modification, with the terms in effect during the Trial Period extended for 5 years.[20]

38.     In its December 2010 Report, the Panel observed a wide range of conversion rates (that is, the rate of converting Trial Period modifications into permanent modifications) for various servicers, noting in particular that Wachovia Mortgage had a conversion rate of 89% vs. BoA's rate near 30%.[21]

---

[19] December Report at 15.

[20] December Report at 15.

[21] December Report at 22.  Through March of 2011, BoA remained the worst performing servicer in terms of converting homeowners from Trial Plans to permanent HAMP modifications. See, *Making Home Affordable: Program Performance Report Through March*

- 10 -

39.     After a homeowner completes a period of 5 years under the terms of the modification, lenders may increase the interest rate on the loan by 1% annually up to the prevailing Freddie Mac interest rate at the time the modification was made.[22]

40.     Though $30 billion is available for this homeowner protection program, less than $1 billion had been spent under HAMP through 2010.[23] According to the Congressional Panel, current projections suggest that far fewer than the four million homeowners initially targeted to benefit will in fact benefit from HAMP, a program that depends for its success upon the good faith efforts of servicers like BoA.[24]

**C.   Treasury's HAMP Servicer Participation Agreement with Bank of America**

**1.   The Agreement**

41.     As noted above, HAMP participation by mortgage servicing companies such as Bank of America was effectuated by the signing of a "Servicer Participation Agreement," which BoA signed on April 17, 2009. As a condition of participation and payment under the Program, once consummated, the Agreement demands "adherence to the Program standards . . . for all the servicer's loans."[25]

42.     BoA's Agreement requires that:

> Servicer shall perform the loan modification and other foreclosure prevention services described in (i) the Financial Instrument attached hereto...(ii) the Program guidelines and procedures issued by the Treasury, including, without limitation, the net present value assessment requirements of the Program...and (iii) any supplemental documentation, instructions, bulletins, letters, directives, or other communications...issued by the Treasury, Fannie Mae, or Freddie Mac in order to change, or further describe or clarify the scope of, the rights and duties of the Participating

---

2011," March 5, 2011, at 1, United States Department of the Treasury. Available at http://www.treasury.gov/initiatives/financial-stability/results/MHA-Reports/Pages/default.aspx.

[22] December Report at 14.

[23] December Report at 16 n.23. An additional Principal Reduction Alternative program, under HAMP, began in October of 2010 to provide servicers the option to reduce principal balances (rather than simply reduce interest rates) for borrowers with loan-to-value ratios of more than 115% (*i.e.*, borrowers significantly "underwater" on their mortgages). *Id.* at 16.

[24] Final Report at 93.

[25] December Report at 14.

- 11 -

Servicers in connection with the Program (the "Supplemental Directives" and together with the Program Guidelines, the "Program Documentation").[26]

Servicer's representations and warranties, and acknowledgment of and agreement to fulfill or satisfy certain duties and obligations, with respect to its participation in the Program and under the Agreement are set forth in the Financial Instrument. Servicer's certification as to its continuing compliance with, and the truth and accuracy of, the representations and warranties set forth in the Financial Instrument will be provided annually in the form attached hereto ... (the "Annual Certification") beginning on June 1, 2010 and again on June 1 of each year thereafter...[27]

43.     Importantly, the Agreement demands that BoA "shall perform the Services for all mortgage loans it services, whether it services such mortgage loans for its own account or for the account of another party," and "shall use reasonable efforts to remove all prohibitions or impediments to its authority, and use reasonable efforts to obtain all third-party consents and waivers that are required, by contract or in law, in order to effectuate any modification of a mortgage loan under the Program."[28]

44.     "[I]n consideration for" promise of payment to BoA by the Treasury under the provisions of HAMP, BoA is required to perform in accordance with the terms of the Agreement. "The conditions precedent to the payment by Fannie Mae of the Purchase Price" include "the performance by the Servicer of the Services described in the Agreement, in

---

[26] *Commitment to Purchase Financial Instrument and Servicer Provider Agreement for the Home Affordable Modification Program under the Emergency Economic Stabilization Act of 2008*, signed by Steve Bailey on behalf of Bank of America, N.A. on April 17, 2009 ("Agreement") at Sec.1.A.  Attached here as Appendix I.

Bank of America, N.A. and BAC Home Loan Servicing, LP signed "Amended and Restated" HAMP Servicer Participation Agreements and Financial Instruments on January 25, 2010, signed by Jack Schakett (former Executive Managing Director at Countrywide, then President and CEO of BAC and Senior VP of BoA, N.A.) on behalf of both entities.  BoA also, memorialized as "Exhibit A" appended to the "Restated" Agreement, agreed in 2010 to participation in the Second Lien Modification Program, the FHA-HAMP program, the Treasury/FHA-Second Lien Program, and the Rural Housing Service HAMP program. Available at http://www.treasury.gov/initiatives/financial-stability/housing-programs/mha/Pages/default.aspx.

[27] Agreement, Sec. 1.B.

[28] Agreement, Sec. 2.A.

- 12 -

accordance with the terms and conditions thereof ..." and "the satisfaction by Servicer of such other obligations as are set forth in the Agreement."[29]

### a.   The Financial Instrument

45.     The Financial Instrument also signed by BoA on April 17, 2009, and incorporated into the Agreement, specifies additional material requirements for satisfaction of the Agreement. Among other things, BoA and other servicers "shall develop, enforce and review on a quarterly basis for effectiveness an internal control program designed to (i) ensure effective delivery of Services in connection with the Program and compliance with the Program documentation; (ii) effectively monitor and detect loan modification fraud; and (iii) effectively monitor compliance with applicable consumer protection and fair lending laws."[30]

46.     Additionally, the Instrument memorializes BoA's "representations, warranties and covenants" to the Government, including that the "servicer is in compliance with, and covenants that all Services will be performed in compliance with, all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements ...."[31]

47.     Specifically, BoA "covenants that it will: (i) perform the Services required under the Program Documentation and the Agreement in accordance with the practices, high professional standards of care, and degree of attention used in a well-managed operation, and no less than that which the Servicer exercises for itself under similar circumstances; and (ii) use qualified individuals with suitable training, education, experience and skills to perform the Services."[32]

---

[29] Agreement, Sec. 4.A. As detailed above, the "Purchase Price" refers to the Government's commitment to pay BoA, through the Government's agent Fannie Mae, initially up to $798,000,000, and later adjusted to several billion dollars, for the performance of its obligations under the Agreement. *See* Agreement, Sec. 4.D.

[30] Financial Instrument, Exh. A to the Agreement, Sec. 4(a). Attached here as Appendix I, Exh. A.

[31] Financial Instrument, Secs. 5; 5(b).

[32] Financial Instrument, Sec. 5(d).

- 13 -

48.     BoA also "acknowledges" in this Instrument that providing "false or misleading information" to the Government "in connection with the Program or pursuant to the Agreement may constitute a violation of: (a) Federal criminal law ... or (b) the civil False Claims Act."[33]  In order to protect the "reputational interests" of the Government in "monitoring the Program," BoA "covenants to disclose to Fannie Mae and Freddie Mac any facts or information that [the Government] should reasonably expect to know about Servicer and its contractors...."[34]

49.     With regard to "Use of Contractors," the Instrument provides that BoA "is responsible for the supervision and management of any contractor that assists in the performance of Services in connection with the Program," such that it "shall ensure that all of its contractors comply with the terms and provisions of the Agreement" with knowledge that BoA "shall be responsible for the acts and omissions of its contractors as if the acts and omissions were by the Servicer."[35]

### b.    The Annual Certification

50.     These requirements, and others, are also contained in the "Annual Certification" filed by BoA in June of 2010 and again on June 1, 2011. The Certification, incorporated into and attached to the Agreement, includes certifications that the "[s]ervicer has performed its obligations in accordance with the Agreement ..." including that "all mortgage modifications and all trial period modifications have been offered by Servicer to borrowers, *fully documented and serviced by Servicer in accordance with the Program Documentation.*"[36]

51.     Also certified is the statement included in Sec. 5(d) of the Agreement, that BoA performed all services under the Agreement in accordance with the highest level of professional

---

[33] Financial Instrument, Sec. 5(f).

[34] Financial Instrument, Sec. 5(g).

[35] Financial Instrument, Sec. 6.

[36] Annual Certification, Exh. B to the Agreement, Sec. 3 (emphasis added).  Attached here as Appendix I, Exh. B. The "Updated and Restated" Annual Certification amends this language to read – "all Services have been offered by Servicer to borrowers, fully documented and serviced by Servicer in accordance with the applicable Program Documentation." Updated and Restated Certification, at C-1, Sec. 3. *See* "Annual Servicer Certification," available at https://www.hmpadmin.com/portal/programs/servicer.jsp.

- 14 -

care, using qualified individuals, and that all relevant information the Government should reasonably expect to know about contractors and their performance has been disclosed to the Government.[37]

52.     In these Certifications, BoA and other servicers also "acknowledge[] that the provision of false or misleading information ... in connection with the Programs or pursuant to the Agreement may constitute a violation of: (a) Federal criminal law...; or the civil False Claims Act ...."[38]

### c.     Treasury's Supplemental Directives and Handbook

53.     Treasury's first Supplemental Directive was issued in April 2009 and set forth in greater detail the specific obligations servicers must satisfy under the Agreements they signed.

54.     As the Directive makes plain, servicers must evaluate the eligibility of every borrower within their portfolios first by determining if a borrower is either in imminent default or is already delinquent, and then by applying the NPV test for eligibility. If "the servicer concludes a current borrower is in danger of imminent default, the servicer must consider HAMP modification," and further "[i]f the NPV result for the modification scenario is greater than the NPV result for no modification, the result is deemed 'positive' and the servicer MUST offer the modification."[39]

55.     Under the 2009 Directive, where a borrower provides verbal financial information to a servicer such as Bank of America, the servicer must send an initially qualifying borrower a solicitation for the HAMP and an offer of a Trial Period Plan. When the borrower returns those documents the servicer "must review them to verify the borrower's financial information and eligibility – except that documentation of income may not be more than 90 days old as of the determination of eligibility."[40]

---

[37] Annual Certification, Secs. 4; 7.

[38] Annual Certification, Sec. 6.

[39] Supplemental Directive 09-01, at 13; 3-4 (April 6, 2009) ("Directive 09-01") (emphasis in original).  Available at www.hppinc.org/_uls/resources/Supplemental_Directive_09-0.pdf.

[40] Directive 09-01 at 5.

- 15 -

56.     Servicers are directed to assist borrowers by "provid[ing] the borrower with information designed to help them [sic] understand the modification terms that are being offered and the modification process," including "clear and understandable written information about the material terms, costs, and risks of the modified mortgage loan ...."[41]

57.     To this end, "servicers must have adequate staffing, resources, and facilities for receiving and processing the HAMP documents and any requested information that is submitted by borrowers," as well as "procedures and systems" that ensure "inquiries and complaints are provided fair consideration, and timely and appropriate responses and resolution."[42]

58.     For the protection of homeowners and the integrity of HAMP, elaborate document retention policies are mandated for servicers. This includes retention of "all documents and information received during the process of determining borrower eligibility," including "detailed records of borrower solicitations or borrower-initiated inquiries regarding the HAMP, the outcome of the evaluation for modification under the HAMP and specific justification with supporting details if the request for modification under the HAMP was denied."[43]

59.     Records must also be accurately "retained to document the reason(s) for a trial modification failure."[44] Where application of the NPV calculus leads to a "decline" for HAMP eligibility, "the servicer must document its consideration of other foreclosure prevention options."[45] All required documentation must be retained for a "period of seven years from the date of the document collection."[46]

60.     Servicers must also make "reasonable efforts to contact borrowers facing foreclosures to determine their eligibility for HAMP" and suspend all foreclosure proceedings

---

[41] Directive 09-01 at 13.

[42] Directive 09-01 at 13.

[43] Directive 09-01 at 13.

[44] Directive 09-01 at 13-14.

[45] Directive 09-01 at 14.

[46] Directive 09-01 at 14.

- 16 -

where the borrower has not been "evaluated for the program, and, if eligible, an offer to participate in the HAMP has been made."[47]

61.    The Directive explains the steps servicers must take to assist borrowers in completing first a Trial Period Plan and then the agreement outlining terms of the final modification plan. Additionally, "[i]f the borrower's submission is incomplete, the servicer should work with the borrower to complete the Trial Period Plan submission."[48] Where it is determined that the borrower fails to meet HAMP eligibility criteria "the servicer should explore other foreclosure prevention alternatives prior to resuming or initiating foreclosure."[49]

62.    All administrative costs associated with processing the HAMP materials are borne by the servicer, and any late charge, penalties, stop-payment fees or other similar fees "must be waived upon successful completion of the trial period."[50] Servicers may not charge or assess other associated fees to the borrower.

63.    This Directive instructs that servicers "must comply with the HAMP requirements and must document the execution of loan evaluation, loan modification and accounting processes" and "develop and execute a quality assurance program that includes either a statistically based (with a 95% confidence level) or a ten percent stratified sample of loans modified ...."[51]

64.    Treasury has issued several Supplemental Directives since its initial April 2009 directive, each of them refining further the requirements that servicers must meet in order to comply with the Agreements they have signed and to remain eligible for Government payments. All Supplemental Directives, reinforce the fundamental obligation of servicers to proactively and in good faith determine the eligibility of every homeowner for a HAMP modification, and to process applications for eligibility and conversion of HAMP Trial Period homeowners to

---

[47] Directive 09-01 at 14.

[48] Directive 09-01 at 15.

[49] Directive 09-01 at 18.

[50] Directive 09-01 at 22.

[51] Directive 09-01 at 25.

- 17 -

permanent HAMP modifications in good faith, conforming to the highest professional standards. Again, these Directives are part of the Program Documentation incorporated into the Agreement.

65.     Servicer obligations are now memorialized and detailed most comprehensively in the "Handbook for Servicers of Non-GSE Mortgages," incorporated as part of the Program Documentation binding on servicers through the Agreement signed with Treasury. The Handbook is "intended to provide a consolidated resource for programmatic guidance related to the MHA program for [non-GSE] loans," and "incorporates and supersedes" prior Supplemental Directives, FAQs, and waivers.[52]

66.     Among other things, the Handbook reinforces the obligation of servicers to assist "escalated cases" (*i.e.*, homeowner complaints) responsibly and comprehensively. Those cases designated as "escalated" include complaints alleging the "servicer did not assess the borrower ... according to program guidelines," "inquiries regarding inappropriate program denials or the content of a Non-Approval Notice," the "initiation or continuation of foreclosure actions" in violation of the program requirements, and cases referred from outside sources including Government sources.[53]

67.     To assist such borrowers in "escalated" cases, servicers are required to "designate one or more persons to comply with the requirements" of the Program "and to handle inquiries that rise to the level of an Escalated case." Servicers must sufficiently staff to "manage the escalation case load" in accordance with time restrictions of the Program and the staff "must be trained on the servicer's case escalation procedures, knowledgeable about [the HAMP program] guidelines and possess the authority necessary to achieve a case resolution ..."[54]

68.     Also outlined in detail in the Handbook are the procedures and timetables servicers like BoA must follow in providing Borrower Notices to "every borrower that has been evaluated for HAMP, but is not offered a Trial Period Plan, is not offered a permanent

---

[52] Handbook at 11.

[53] Handbook at 38.

[54] Handbook at 38.

modification, or is at risk of losing eligibility for HAMP because they have failed to provide required financial information."[55]

### 2. Bank of America and other servicers' performance

69. At the end of 2010, BoA was responsible for approximately half of the backlog of HAMP modification trials awaiting a determination of conversion into permanent status.[56] BoA has the lowest conversion rate amongst all servicers for moving homeowners from Trial Plan to Permanent Modification.[57] For homeowners whose HAMP Trial Plans have been cancelled, by far the largest group among those serviced by BoA were placed in proprietary, non-HAMP-compliant, modifications.[58] The second largest group has experienced foreclosure starts.[59] Of those BoA-serviced homeowners denied HAMP Trial Period Plan participation in the first instance, the largest group of homeowners among them has also been placed into proprietary modifications, followed closely by those homeowners experiencing foreclosure starts.[60]

70. The requirement of the Agreement that BoA "adhere to all program standards" through good-faith efforts to assist homeowners with HAMP modification and modification eligibility determinations is in tension with BoA's interests, as a servicer, to maximize its profits. These tensions have been examined and commented on by the Oversight Panel.[61]

71. HAMP aims to counteract those incentives that lead to foreclosures and less favorable modifications for homeowners. Among those countermeasures are the Government payments made to servicers to encourage qualification of homeowners and to directly subsidize the interest rate reductions on HAMP-modified mortgages.

---

[55] Handbook at 49-53.

[56] December Report at 22.

[57] Making Home Affordable Program, *Servicer Performance Report through April 2011*, at 9 ("April 2011 Servicer Report"). Available at https://www.hmpadmin.com/portal/news/press.jsp.

[58] April 2011 Servicer Report at 10.

[59] *Id.*

[60] *Id.* at 11.

[61] These tensions derive from the anti-HAMP-modification economic incentives that drive servicers like BoA. December Report at 17; 59; Final Report at 87 n.277.

- 19 -

72. Through October of 2010, servicers cancelled over half a million trial modifications, with "incomplete requests" (meaning purported failure of the homeowner to provide the needed documentation) as the single largest reason given to Treasury for the cancellations by BoA and other servicers.[62] Between 15-20% of those failed modifications have resulted in initiation or resumption of foreclosure proceedings and scores of those homes have been foreclosed upon. Another 40% of homeowners have received "alternative" proprietary modifications on terms dictated by the servicer and not conforming to HAMP guidelines.[63]

73. The Congressional Panel noted that since the inception of HAMP in 2009, there had been (through October of 2010) approximately 4.4 million foreclosure starts while less than 500,000 homeowners had been placed in active permanent modifications under HAMP.[64] Since October, barely 100,000 homeowners have been added to the number of active permanent modifications, while foreclosure numbers have continued to rise.[65]

74. According to the Treasury Department, for the HAMP modifications it has granted through May 31 of this year the Defendants have received over $75 million in so-called incentive payments from taxpayers under BoA's HAMP Servicer Participation Agreement.[66]

## V. ALLEGATIONS

**A. Bank of America Violates its Agreement with Treasury by Fraudulently Handling Homeowner HAMP Submissions, Inquiries and Complaints**

75. Since its Agreement with the Treasury Department was signed in April of 2009, BoA has been aware that honest business practices conforming to the requirements of that Agreement, an Agreement intended to maximize the number of homeowners participating in HAMP, would cost the bank millions of dollars.

---

[62] December Report at 29-30.

[63] December Report at 30-31.

[64] December Report at 46.

[65] April 2011 Servicer Report at 2.

[66] *Supplemental Information – Home Affordable Modification Program, Non-GSE Incentive Payments* (through May 2011), at 1. Available at http://www.treasury.gov/initiatives/financial-stability/briefing-room/reports/tarp-transactions/Pages/default.aspx.

76. For that reason, instead of honoring its contract with the Government to, in good faith, help as many distressed homeowners as possible, it made a calculated decision. It would permit just enough HAMP modifications to occur to create a defense (however untenable) against Government agencies, Congressional skeptics and the public that it was making best efforts to comply with its Agreement. Simultaneously, however, it would develop business practices designed to intentionally prevent scores of eligible homeowners from becoming eligible or staying eligible for a permanent HAMP modification.

77. Even more self-serving, BoA has intentionally failed eligible homeowners from the HAMP modification process, often forcing them into predatory "modification" programs designed to cost the homeowner more money. This despite the fact that the Agreement requires BoA to "evaluate borrowers for and (assuming criteria are met) provide them with a HAMP modification first, ensuring a set affordability standard, and only consider a proprietary modification, the terms of which are determined completely by the servicer, after it has been determined that HAMP is not an option."[67]

78. As for homeowner complaints and the HAMP requirement that servicers properly and promptly respond to and resolve such complaints, BoA has failed to comply by design. BoA and its agents never properly hired, trained, or equipped a workforce to genuinely address the scores of homeowner complaints and regulatory inquiries, and instead developed systems and procedures that deliberately obfuscate, mislead, and otherwise deceive those homeowners and regulators, resulting in ineligibility through no fault of the homeowner.

79. Despite this concealed fraud, BoA has collected tens of millions of dollars from the federal Government for the comparatively small percentage of permanent HAMP modifications it has permitted. In other words, BoA has had it both ways. BoA has continued to maximize the value of its mortgage portfolio with anti-HAMP-modification practices and managed to make money by committing fraud on homeowners and the United States Government.

---

[67] December Report at 35.

-21-

80.     The false statements, claims and certifications made to Treasury in the context of its Agreement (including its 2010 and 2011 "Annual Certification[s]" required by the Agreement) were and are material to, and conditions precedent for, the payment of millions of taxpayer dollars to Bank of America.

### 1.     BoA outsources HAMP work to Urban Lending Solutions

81.     After acquiring Countrywide Financial in January of 2008, BoA's corporate structure became ever more complex. Acting under Bank of America CEO Brian Moynihan, Barbara Desoer, former President at Countrywide Financial Corp., now President of Bank of America Home Loans and Insurance ("HL&I"), oversees the Mortgage Servicing operations of Bank of America, including its Home Retention Division ("HRD"). Kenneth Scheller, former Managing Director of Countrywide Home Loans, is a BoA Senior Vice President managing HRD. Separate from HRD, under the Servicing umbrella, exists the Executive Customer Relations ("ECR") group historically handling highest-level homeowner and regulatory inquiries and complaints. Also highly relevant, the Strategy, Governance, and Controls ("SGC") group has principals intermixed within the HL&I corporate structure.

82.     The ECR group within BoA contracted with companies, particularly Urban Lending Solutions, to handle a variety of services relating to its participation in HAMP under the Servicer Provider Agreement.

83.     Urban is a privately held company based in Pittsburgh, Pennsylvania with a presence in Broomfield, Colorado, providing private label services to the mortgage industry. On its website, Urban describes itself prominently as the "Premier and volume leader for home retention (loan modification) analytics and fulfillment to the mortgage servicing industry for over 2 years" and notes that it has recently been named to Inc. 500's list of fastest growing private companies in America.[68]

---

[68] Available at http://www.urbansettlement.com.

84.     Urban claims that its home retention work for mortgage servicers has made it "an industry leader in helping families keep their homes, processing nearly 1 million home retention transactions since 2007."[69]

85.     In addition, while many companies have struggled in the wake of the housing crisis, Urban has ramped up its workforce. Urban's CEO credited this "hiring mode" with the company's "'preferred vendor'" relationship with banking giant Bank of America, which relies on Urban [ ] to provide title, appraisal and loan closing assistance."[70]

86.     In addition to past business, after signing its Agreement with Treasury, Bank of America outsourced a significant part of its Servicer Agreement obligations to Urban. Given that BoA is the largest servicer in the country, this method of outsourcing is not surprising and was anticipated by conditions placed on BoA in its HAMP Agreement. According to BoA, thousands of workers (including Urban employees) are now involved in the loan default program.[71]

87.     Urban's "home retention" operations have now handled Bank of America's HAMP loan modification obligations for scores of homeowners. In particular, Urban has been delegated part of the HAMP requirement to respond to regulatory inquiries and homeowner complaints about BoA's handling of homeowner HAMP inquiries, document submissions, and eligibility determinations. As described further below, Urban assists BoA in violating its obligations to Treasury, and to homeowners, by systematically preventing homeowners from mandated opportunities to qualify for or remain in the HAMP, failing to advocate for homeowners, and failing to genuinely attempt proper resolution of escalated complaints. All of this is done at BoA's direction with the goal of maximizing its revenue.

---

[69] Available at http://www.urbansettlement.com/company/index.htm.

[70] Dan Fitzpatrick, "Mortgage Woes Lead to Loss of Jobs Here," Post-Gazette.com, January 30, 2008, available at http://www.post-gazette.com/pg/08030/853212-28.stm.

[71] Aldo Svaldi, "Broomfield's Urban Lending Solutions Grows Quickly Amid Stressful Environment," denverpost.com, January 30, 2011, available at http://www.denverpost.com/business/ci_17234161 ("Denver Post Article").

- 23 -

88.     Urban consists of two worksites relevant to its BoA-contracted HAMP activities. Urban's so-called "390" group (so named because then-located at 390 InterLocken Crescent in Broomfield, CO) received and scanned incoming HAMP financial documentation and other paperwork from homeowners serviced by BoA and stored documents in what became the Urban Portal digital imaging repository. BoA outsourced to Urban this document retention operation mandated by the terms of the HAMP Agreement.

89.     BoA has solicited and directed homeowners to return documents, via FedEx, to this Urban location, which has received hundreds of thousands of FedEx packages from prospective HAMP participants. Urban hired scores of employees at 390 to accept and scan millions of pages of original documents, including homeowner financials, saved on the Urban Portal. Unfortunately for homeowners, as explained further below, this repository was designed as a black hole for their documents.

90.     Another Urban Broomfield location, at 11802 Ridge Parkway, housed Urban's Outsourced Services unit, offering comprehensive vendor services custom-tailored for clients such as BoA. This location was responsible for handling, among other things, BoA regulatory responses and escalated homeowner complaints concerning the HAMP. BoA committed to making Urban a Tier 1 vendor in exchange for working with it to meet Bank goals, goals diametrically opposed to the intent and purpose of HAMP. This status offered Urban the prospect of hundreds of millions in revenue for years to come.

91.     The Outsourced Services unit functioned initially within BoA's ECR group, with temp workers and Urban employees given BoA titles within BoA's Office of the CEO and President. To the outside world of homeowners and regulators, Urban's workforce appeared indistinguishable from BoA's own employees.

**2.      Relator witnesses and challenges systemic HAMP fraud**

92.     On April 30, 2010, Mackler began work at Urban as a temporary contractor. For three weeks, Mackler and several dozen other temporary workers were trained in the job function of Customer Advocate for Bank of America's Office of the CEO and President. This training

- 24 -

was led by "in-classroom" BoA officers, as well as a contingent of on-site "out-of-classroom" BoA executives. Additionally Urban employees Sean Jefferson and Lisa Reichert facilitated training for the first week. Mackler and the others were to begin thereafter as Customer Advocates in Urban's Outsourced Services Division. Virtually none of the trainees were remotely qualified for the positions they then filled, nor were they given adequate training for the job. Mackler observed that those persons with more talent, intellect, and qualifications did not last long, but were often fired or encouraged to quit.

93.     Mackler was instructed by the trainers that the job of Customer Advocate was to advocate for individual homeowners in response to a regulatory inquiry on their behalf, or following an executive complaint received by Bank of America. It was emphasized that two categories of homeowners existed: those in the "default" sphere and those in the "non-default" sphere.[72] Those in the default sphere are of relevance here. Within that sphere are homeowners not current on mortgage payments or facing imminent default, and in need of loan modification. Treasury requires BoA to determine whether each and every such homeowner might be eligible for a HAMP modification.

94.     Mackler and other trainees were given a crash course on Making Homes Affordable and the HAMP guidelines. Mackler was told, with the others, that the advocates were being hired to handle the influx of complaints resulting from the HAMP commitments.

95.     These Customer Advocate trainees, including Mackler, were told they would be advocating at the highest level of authorization "acting fully on behalf of the CEO and President" when inquiring and advocating on behalf of a given homeowner within the Bank. In truth, the trainees were not remotely qualified to intelligently advocate or seek proper resolution for homeowners, which, as Mackler soon discovered, is precisely what BoA desired. Furthermore, BoA developed numerous protocols and procedures to prevent Customer Advocates from properly researching and resolving HAMP inquiries and complaints.

---

[72] For purposes here, "non-default" complaints refer to any complaints not addressing loan defaults or modifications.

### a.   Relator begins as a "customer advocate" for BoA

96.    On or about May 24, 2010, Mackler began work on the floor as a Customer Advocate – answering the phone, "Thank you for calling Bank of America's Office of the CEO and President, this is Gregory Mackler. How may I help you?" At that point, Mackler was not aware of any fraudulent activity and was looking forward to advocating on behalf of struggling homeowners and helping to correct what was being characterized as an enormous volume of HAMP "errors" within the Bank's multiple lines of business.

97.    Two weeks prior to Mackler's training, approximately 150 temporary workers were trained as Customer Advocates and began in that role at Urban. Mackler immediately began assisting dozens of these advocates on the floor with "on the job training" despite being part of the latter, smaller trainee pool. The marginal relevant industry experience the temp workforce had, if any, did not translate to the Customer Advocate position, which was primarily an operations position. Immediately Mackler became aware of an unusually high turnover rate within the temp workforce and amongst the managers that were Urban employees. Mackler began to acquire systems knowledge, and informally began inquiring about the general business practices "on the floor."

98.    In short order, Mackler learned that homeowners were not being advocated for, as the majority of the temporary workers had absolutely no idea how to begin to perform their job responsibilities, nor how to use and access the tools necessary for effective homeowner advocacy. In fact, Mackler discovered that many of the tools necessary to properly research and resolve inquiries received from regulatory authorities and homeowner complaints were not being made available to the Urban Advocates. Advocates could not and were not trained to access the necessary BoA computer systems, neither did they have any means to contact the relevant BoA associates that were working on HAMP applications corresponding to regulatory inquiries or homeowner complaints.

99.    Advocates were told that it was a "downstream process" and that they did not need to communicate with the line of business for effective advocacy on HAMP complaints.

- 26 -

Many temp workers quit the job out of frustration and a fear that they would be terminated because of their perceived incompetence, though in fact (as it became clear) BoA had orchestrated it that way. As Mackler continued to discover, BoA was not looking for employees to actually advocate and escalate matters to assist homeowners in entering the HAMP process, but was merely attempting to create that impression. Instead, the entire focus of the operation was on "closing" issues.

100. Urban employees, known as Team Leads (or Team Managers) and Assistant Team Leads/Quality Control ("QCs"), ostensibly supervised "the floor" of Customer Advocates and provided quality checks on their advocacy. For every 10 or so advocates, a Team Lead was formally in charge. As Mackler soon realized, however, these Team Leads and QCs (though they became Urban employees) almost entirely came through temp agencies and were themselves no more qualified for their positions than the Advocates, having experienced the same training.

101. Mackler also began to learn that the BoA architecture for handling HAMP mortgage modification complaints was rooted in fraud. One of Mackler's first homeowner complaints that he handled as a Customer Advocate came from a person we will refer to as Mrs. E., a resident of Florida. In 2008, Mrs. E. and her husband sought a modification from BoA as a result of the husband's loss of income. On numerous occasions she had contacted BoA attempting to learn the current status of her request, now outstanding well into the time period that the Agreement required BoA to consider her for a HAMP modification, and to learn the status of the documentation she had provided to BoA numerous times.

102. As the "single point of contact" Customer Advocate, Mackler escalated throughout the Bank of America corporate hierarchy, in a good-faith effort to address the homeowner's concerns.[73] Mackler learned that a BoA "workout negotiator" (a BoA employee

---

[73] HAMP requires servicers to create a "single point of contact" for homeowners. Though designed to prevent homeowners from being subject to the confusion of multiple contacts with various departments, BoA uses the "single contact" requirement perversely. By preventing homeowners from going anywhere *but* to the single point of contact responsible for addressing their concerns, BoA simply prevents that single contact from effectively advancing a given homeowner toward consideration of HAMP eligibility – there being no one else for the homeowner to turn to.

- 27 -

named Robin at HRD) had solicited Mrs. E., offering that if she voluntarily cancelled her HAMP request, BoA would provide her with a permanent proprietary modification within two weeks. This was a plain violation of HAMP requirements. In an effort to push her toward proprietary modification of her loan, Mrs. E. was also told that it would take "over a year" to complete a proper HAMP review (another violation of HAMP requirements).

103.    Mackler reached out to HRD to determine the genuine status of Mrs. E.'s modification review and to resolve apparent confusion about BoA's handling of the matter and alleged solicitation. After repeat emails from Mackler to various BoA personnel attempting to get a response, Mackler continued to escalate.

104.    Mackler asked if *any* modification review was under way for Mrs. E. and her husband. The SVP refused to accommodate any request for information, and redirected Mackler back to her uncooperative reports. Mackler then escalated within Urban, to John Beranich (VP of Outsourced Services at Urban) complaining of BoA's treatment of Mrs. E.'s complaint, and the lack of any cooperation for the Office of the CEO and President.

105.    Beranich reached out to Tom Reilly, a BoA executive who fulfills a variety of roles within ECR and SGC, and the person integrating the contractors into the ECR model for Default Servicing. Reilly at that time was BoA's relationship manager with Urban. Reilly told Mackler to call BoA executive Ken Scheller, and related that all of HRD reported up to him. At this time Mr. Scheller was in the role of SVP of Risk Management for BoA. Mackler called Scheller and left a message, but hearing no response, he contacted several high-level executives, both above and below Scheller.

106.    Scheller eventually returned the call to Mackler, though not fully understanding that Mackler was merely a Customer Advocate at an outsourced company, rather than an Executive within BoA, or even a principal with the outsourced company. Scheller quickly reminded Mackler that BoA and HRD was "not of course interested" in faithfully reviewing HAMP modification requests, and that he should "back off" the issue. This was stated as if it were common knowledge of which Mackler should have been well aware. Scheller repeatedly

- 28 -

expressed frustration that he thought everyone "at the Bank" was "on the same page" in terms of not really working to legitimately review homeowners for HAMP, and thought the ECR group fully understood this as well. Mackler, unbeknownst to Scheller, was not a principal of BoA's ECR group.

107. Scheller continued to express frustration as to why ECR Customer Advocates would be calling to bother his HRD Associates regarding individual homeowner HAMP modification reviews and complaints, and escalating through his Division on their behalf. Scheller described that this compromised the HRD Associates' efforts to follow executive direction to decrease HAMP participation. Scheller stated that advocating on a homeowner's behalf by escalating throughout HRD, when the HRD Associates were just following direction, was going to complicate HRD operations. Mackler told Scheller that he should speak with Beranich regarding these concerns, and considering that Beranich had previously had oversight over the Urban "390" HAMP documentation project for HRD, they might find common ground, now that Beranich was directing the ECR advocacy project for Urban.

108. Mackler disclosed his conversation to Beranich, both verbally and via email. Mackler was asked by Beranich to send him and only him an email describing this conversation with Scheller. Beranich brought Mackler to his office, where Mackler learned that Reilly was listening in via conference call.

109. Reilly asked Beranich a series of questions to understand exactly what Scheller had revealed in his conversation with Mackler. Reilly directed Beranich to ensure that Mackler be given direction not to tell anyone, at either Urban or BoA, that the conversation with Scheller had ever occurred. Beranich informed Mackler that he was a "rising star" and would soon be hired as a QC, and demanded again that Mackler keep this information strictly confidential.

110. Mackler soon learned that BoA had given direction that the BoA Subject Matter Experts ("SME"s) (Anna Corder and Susan Park, AVP Operations Specialists at BoA and Kristina Raisley, a BoA Advocate) staffed on location at Urban were no longer available to answer questions about how to perform the job function, or about how to respond to regulatory

- 29 -

inquiries or executive complaints. Urban temporary workers were given direction not to interact with them at all. Given the fact that QCs and Team Leads themselves had no more training than Advocates, and were charged with supervising and assisting Advocates to handle regulatory inquiries and customer complaints, both Team Leads and Advocates had nowhere to turn. Amidst these changes there was mounting pressure from BoA executives and from Urban Executives to "close" more Service Records (or "SRs," as the homeowner cases were termed) to meet daily and weekly "goals."

111. While attempting to advocate for homeowners, Mackler continued to encounter a "Chinese wall" within BoA's HRD Division which made it impossible to research any resolution, or learn accurate information on behalf of homeowners regarding HAMP modifications. Scheller had specifically alluded to this one-way communication channel as being established by design. Even basic questions whether a HAMP modification review was currently being conducted for a homeowner, like Mrs. E., were not to be answered.

112. Associates in HRD, so-called "Workout Negotiators," were trained to communicate that they were not a part of the MHA/HAMP process, that the caller had reached the "wrong department," and that the HAMP process was a "downstream process." This did not reconcile with internal systems that documented who the designated Workout Negotiator/HAMP Monitor was as the "point of contact." As such, no information could be made available as there was no "point of contact" even for an Advocate in the Office of the CEO and President acting on a regulatory inquiry with purported "full authority" to resolve a regulatory concern.

113. Mackler experienced this situation time and time again as a Customer Advocate. Mackler witnessed scores of other Advocates experience the same stonewall, while either coaching or training them, and observed countless homeowner requests for loan modification assistance closed by Advocates who failed to properly resolve homeowner inquiries after being shut down by BoA in their efforts to address HAMP concerns. This was done out of pressure by BoA to close files even where the line of business (*i.e.*, HRD) was itself obstructing the process by refusing to verify what should have been readily ascertainable information about the status of

- 30 -

documents or a HAMP eligibility determination. This failure to verify *any* information was established by BoA and a symptom of keeping Advocates from learning the information they needed in order to *be* Advocates.

### b. Relator becomes a subject matter expert

114. In June 2010, around the same time as his conversation with Scheller, Mackler was promoted to the position of internal Subject Matter Expert for Urban, one of four selected for that position. The purpose of the role was to cascade information to the other Customer Advocates regarding the proper way to close SRs, research regulatory and executive complaints, and resolve homeowner concerns. This was now a defined resource for Advocates "on the floor," whereas Mackler previously, but informally, did much the same work.

115. In the position, Mackler was ostensibly asked to enable and assist the Advocates on the floor, to define and verify BoA guidelines to ensure proper advocacy for homeowners. Given his frustration as an Advocate, Mackler thought he might have more authority to properly investigate, review, research, and resolve regulatory inquiries and executive homeowner complaints in this role. He immediately learned he was not permitted to do so, and was stopped at every turn. Mackler was told that the only goal was to "close" the SRs, and that Urban's Outsourced Services group would only survive by meeting the client goals.

116. Mackler continued to press for hard answers regarding Mrs. E., as her complaint continued to be unresolved despite repeat escalation. Urban pressured Mackler to simply "close" the SR. In over two months, Mackler had been unable to determine even whether Mrs. E. still had an actual open HAMP modification review underway. Associates within HRD still categorically refused to tell Mackler whether Mrs. E. was under review, and if so, what kind of modification review.

117. Mackler documented this long trail of obstruction and obfuscation by numerous BoA personnel in the Siebel system of record (a legacy holdover complaint tracking system from Countrywide) as well as with seemingly countless emails. At one point a National Servicing Executive communicated to Mackler that "behind the HAMP curtain" one Morgan Haijduk (a

- 31 -

Workflow Coordinator for BoA) could provide the information. Mackler contacted Haijduk, who stated that his number should not have been given out, that he should not be contacted, and that the HAMP process was orchestrated to be a "downstream process" only. Haijduk continued to obstruct Mackler's efforts at research and resolution.

118.     Eventually, Vinesh Reddy (BoA AVP of Advocacy/Exclusions in HRD) and Haijduk participated in a conference call with Mackler to discuss the MHA/HAMP process, and specifically Mrs. E.'s concerns of a predatory foist. Reddy told Mackler that Mrs. E. was "on hold," as were all BoA homeowners that had requested HAMP modification assistance.

119.     Reddy and Haijduk explained to Mackler that BoA had instructed that there be a *de facto* lockdown, stalling all HAMP modification reviews, and keeping all homeowner inquiries in abeyance. This delay, communicated by Reddy and Haijduk, effectively allowed BoA to eliminate a large backlog of applications and inquiries from HAMP eligibility. This was to be justified based upon a novel interpretation of a Supplemental Directive requiring documents to be submitted by homeowners within 30 days, and completely reviewed 30 days after receipt. BoA's "interpretation" was to hold all modification reviews until June 1, 2010 after which time HAMP eligibility for these homeowners would be permanently eliminated by BoA's manipulation of the new 30/30 directive.[74]

120.     Mackler pressed and Reddy confirmed this was the instruction received directly "from the top" of HRD, HL&I and Corporate (meaning Desoer and Moynihan). Mackler asked whether such a protocol would not be transparently fraudulent. Reddy stated that executives had directed that some defined number of homeowners would be permitted to "slip through" in order to create the appearance of a legitimate HAMP review process.

121.     Both Reddy and Haijduk confirmed that this was common knowledge within the executive channel, and had been directed in unambiguous terms. Mrs. E., Reddy made clear,

---

[74] In June of 2010, a new requirement that homeowners provide additional income-related documents in order to establish HAMP eligibility was imposed. Handbook at 56, 59. Mackler learned that BoA, knowing of this change well in advance, improperly held scores of reviews in abeyance in violation of then-existing requirements, so that it could render them "ineligible" for HAMP due to failure to provide documents never required at the time.

-32-

was part of the group that would be improperly delayed and ultimately sent an "adverse letter" denying her a HAMP modification under the pretense of the new 30/30 rule for complete documentation and review.

122. Mackler continued to challenge this effort. He inquired about instances of "Bank Error" where there was documented proof that a Bank Associate adversely advised a homeowner in a manner that prevented him or her from meeting the Bank's requirements for documentation or successfully completing the next step in the HAMP process. Mackler observed numerous instances where the BoA advocates charged with answering homeowner questions regarding HAMP modifications were providing blatantly incorrect information. Mackler in fact identified that Mrs. E.'s paperwork was falsely recorded as "not received" even though a FedEx tracking number showed obvious receipt. HRD had falsely documented its records to the contrary, as Mackler came to see in scores of cases.

123. Reddy and Haijduk stated that even where there existed a documented Bank Error, there was no provision allowing for a homeowner to challenge or appeal the permanent loss of HAMP eligibility. Mackler continued to challenge this point, piecing together the manner in which this had been orchestrated.

124. Mackler observed that HRD's system of record was regularly populated with scripted comments for a homeowner undergoing HAMP review, to the effect that documents were alleged to be "missing" or "incomplete," and that calls were not to be transferred. Efforts were simply not being made to communicate this information to homeowners. Mackler questioned the practice whereby homeowners were then informed that no new information on their modification review was currently available, that they remained "under review" but that someone would call them within 60 days, which was outside the 30/30 clock. Meanwhile, ECR was directing that homeowners be advised Trial Periods were expected to take six months or longer. Reddy and Haijduk acknowledged the incongruity of this practice, but Haijduk then became so distressed about what was being revealed in the call that he hung up.

- 33 -

125.   Mackler and Reddy continued to talk about MHA/HAMP operations. Mackler stated that it would not be acceptable for Mrs. E. to be included in the "adverse response" group as it was improper and there was heightened litigation risk with this homeowner. Mr. E was an Underwriter with AIG, and the homeowner had been documenting all the Bank errors and improprieties of her Modification review that had originated with an initial inquiry in 2008. Reddy acknowledged that he would personally "get involved" to help get the homeowner file "through QC" instead of being rejected with the rest of the homeowners. Ultimately Mackler was able to get Mr. and Mrs. E. a permanent HAMP modification, although it was not made permanent until several months later.

126.   As a Subject Matter Expert, Mackler continued to witness the same improprieties he observed as a Customer Advocate, *e.g.*, homeowners being told they were "currently under review" for HAMP modification when several months had passed and there was no evidence of any such review. Instead, system documentation directed that calls not be transferred and that documents were missing or incomplete. This despite evidence that all materials had been sent repeatedly (using the Bank-provided FedEx mailers no less).

127.   Among other practices, Mackler reviewed several complaints where BoA had classified a home as "vacant" or having been leased, (*i.e.*, not "owner-occupied") in order to disqualify an otherwise qualified homeowner from HAMP eligibility. These "drive-by" assessments of vacancy occurred even in cases where homeowners sent photographs of their occupied homes, well-kept gardens, and other obvious indicia of owner occupation, and stated that they never left their homes for more than a few hours. Mackler observed that some homeowners were repeatedly forced to submit documents challenging these "vacancy"-based denials.

128.   In July, Mackler was temporarily reassigned, as part of his Subject Matter Expert responsibilities, to assist in the training of new Customer Advocates for their three-week training period. At that time, Mackler was informed by Joe Bosse (Mackler's Team Lead) and Elizabeth Farmer (formerly a QC, now the Team Manager of the QCs) that he would soon become a QC

- 34 -

himself (as Beranich had promised). At that point he would no longer be a temp but would be hired by Urban as a full-time salaried employee.

129. During the training, Darius Alexander (one of Urban's Assistant Training Managers) emphasized repeatedly to the new Customer Advocate trainees that how they were being trained may be different from how they were expected to perform their job function "on the floor." Alexander repeatedly established that if the trainees were told to do something different once "on the floor," they should do what their Team Lead directs, not what they recall from training. He established that the workforce was under contract with Bank of America, and that the client dictated how Urban performed its job function and the quality guidelines of the positions. Alexander established for the temps that they would have the most success by doing as they were instructed by Team Lead and Bank relationship managers, not by adhering to the "*right*" way to do things."

130. Urban had experienced extreme levels of employee turnover, understood internally as "churn." BoA was dictating terminations of Customer Advocates *en masse* and other Advocates were quitting under the pressure of impossible production expectations that the Bank had established. In this environment, it was emphasized to trainees that even if the HAMP guidelines suggested that something else should be done in response to a complaint or regulatory inquiry, an Advocate always needed to do what they were told "on the floor" by their Team Lead. It was established that "we" only all had jobs if Urban as a whole met the production expectation BoA had established. Doing things the "right way" individually could translate into temps no longer being needed, and everyone "losing their jobs."

131. It was made plain in the training that Team Leads emphasized closing the files, not following specific BoA ECR quality protocols. This emphasis on deviating from formal guidelines and protocols led an appreciable number of trainees to actually drop out of the training during each session. Mackler observed a population of trainees that would articulate a clear understanding of their personal culpability in what they were being asked to do, who would

- 35 -

then have interactions with Trainers or BoA executives that resulted in their voluntarily quitting, or subsequently being pulled off the temp assignment by their staffing agency.

        **c.**    **Relator is hired as a QC**

132.    On July 26, 2010, Mackler accepted an offer of full-time employment as a QC (Quality Control) at Urban. In that capacity, Mackler reviewed the (a) final draft "Response Letters" written by Customer Advocates to be sent to the regulatory entity or to the homeowner, (b) the process by which the Advocate addressed the stated concerns, (c) the documents provided by the complaining homeowner, and (d) the system documentation that resulted from the research and resolution. Additionally, Mackler was assigned to evaluate the work of the other QCs as part of a "second QC" process. In looking at this larger sample of SRs it became clear to Mackler that homeowners' "original" documents were seemingly never accessible to HRD during the homeowner's HAMP review, nor to any Customer Advocate or QC investigating a regulatory or executive complaint. The Advocates and QCs only saw whatever materials the homeowner sent in *again* and in furtherance of his or her complaint itself, after they had escalated to the highest office within BoA, or after they had contacted a regulatory agency.

133.    Mackler evaluated Customer Advocates' handling of homeowner complaints once they were submitted for closure, under the auspice of having been brought to resolution. In that role, Mackler was specifically instructed not to audit whether Customer Advocates, HRD advocates at BoA (who initially review HAMP applications), or others had falsified information on the system of record for a given homeowner's account. This direction was repeated on national conference calls with BoA ECR quality led by BoA employee Shawn Pierce. Such falsifications typically included falsely documenting that homeowners had not satisfactorily submitted their financial documentation necessary for HAMP eligibility determination, when in fact it was abundantly clear that homeowners had sent in these requirements multiple times within the necessary deadlines. Often those homeowners provided certified mail or FedEx tracking numbers. In other instances, Customer Advocates or HRD associates would falsify

- 36 -

research or comments, to allow closure to meet suffocating "production goals" the Bank demanded.

134.    Mackler encountered hundreds of homeowners that showed convincing evidence of document submission. Mackler saw the incongruity between HRD's documenting of financials as "missing" or "incomplete" without specificity, and the manner in which Customer Advocates were documenting the system of record to "close" without proper resolution. Mackler was given specific direction not to investigate or inquire about what Customer Advocates were documenting onto BoA systems, even when it became clear that a business practice "on the floor" was in place to fabricate any research to substantiate closure, even though the homeowner would ultimately suffer adverse consequences, including foreclosure, and even though the regulatory responses were being fraudulently authored. These practices were known as routine and observed by Mackler.

135.    Mackler also observed in this capacity that several homeowners were required by BoA to enter a "Special Forbearance" program before HAMP eligibility was determined. This forbearance program, however, functioned to increase a homeowner's debt and overall obligation to the lender. This resulted often in an "excessive forbearance" determination. By virtue of this, several homeowners were disqualified under the NPV calculation from participating in HAMP, just as BoA intended.

136.    Other homeowners were required to make payments to BoA that were either never credited properly toward Trial Period payments or credited against their principal, but instead parked in a "partial account." At other times these payments were not applied in a timely manner so as to render the payment "late." By not applying the payment in a timely manner, BoA could disqualify otherwise qualified homeowners from securing a permanent HAMP modification. Mackler at times demanded that a homeowner's payment be immediately applied to his Trial Period balance, but encountered obfuscation. Mackler inquired why payments held in "partial" accounts would often equal or exceed a note payment, but would not be properly

- 37 -

applied. He learned that HRD held off until a modification review was "complete" or "permanent" before any crediting, an obvious violation of HAMP requirements.

137.    Mackler's efforts to diligently follow-up on complaints he reviewed was not appreciated or valued. He was told to stop inquiring about payment irregularities and other improprieties. During Mackler's first week as a QC, Farmer (Team Manager of Quality at Urban) informed him that already he needed to increase his production by "passing" more of his reviews, or SRs. Mackler responded that his "real" production was very high, and that even though the SRs being submitted to him did not meet BoA ECR Quality guidelines, he was reviewing more than other QCs. The vast majority of these reviews consisted of Customer Advocates' draft letters informing regulatory agencies or homeowners that a HAMP review was "pending" or currently under way, when it was actually documented no such review was pending at all or that review was derailed by "missing" or "incomplete" documents, none of which was told to the homeowner.

138.    The practice of merely responding that a review was "pending" was born of a BoA ECR business practice known as "forward progress" – as long as a review was currently underway, the Customer Advocate was not responsible for properly researching and reviewing the regulatory or homeowner concerns. Mackler would not agree to pass or approve such untruthful "forward progress" closings where an actual review was not active.

139.    Farmer reminded Mackler that he, and other QCs, only get "credit" when they pass or approve a given review. BoA and Urban did not give credit for properly identifying where an SR closure did not meet BoA ECR Quality guidelines. The requirement was to pass a fixed number of reviews per day, and Mackler was not meeting that arbitrary quota. Farmer explained further that by failing to pass SR reviews, the number of complaints "closed" by Urban was not meeting the requirements of BoA. Mackler told Farmer that he would not indiscriminately "pass things through" to satisfy arbitrary production metrics that fraudulently corrupted the HAMP process. Mackler stated that his reviews of other QCs SR closures revealed that they were never properly reviewed.

- 38 -

140.     Most direct, Farmer told Mackler that files should be passed even if they did not
properly meet guidelines, as "everyone was at risk of losing their jobs." Farmer directed that
BoA was threatening to shut down Urban's ECR project on a daily basis if more SRs were not
closed to meet the daily and weekly goals. It was explained that BoA did not care if proper
protocols were met, only that they wanted these regulatory and executive complaints "closed" at
all costs. In context, that meant "passing" SRs falsely, even if it resulted in an eligible borrower
being further misled or wrongly denied eligibility leading to foreclosure.

141.     Despite repeated threats from Farmer that Beranich would terminate him, Mackler
made clear he would not "pass" on any files that were not properly processed for the
homeowner. The justification given, and advanced by BoA, was that any "mistake" in passing
SRs could be addressed when the homeowner initiated *another* complaint. In other words, the
logic was to close files as quickly as possible and worry about the errors the next time. For many
homeowners, of course, there would be no "next time" because pending foreclosure and
increased fines and penalties would commence.[75]

142.     In or about August of 2010, Beranich called a meeting with Farmer, Betsy
McManaman (then an Urban Production Manager, to which Team Leads report) and all the QCs,
including Mackler. Beranich informed the QCs that they would ultimately report to
McManaman through Farmer and that a "Drive to Five" to reduce the complaint pipeline was
being implemented. This was a BoA effort to reduce the "pipeline" of complaints. He stated
further that Brian Moynihan himself, the CEO of BoA, was pushing to drive down the number of
existent ECR regulatory and homeowner complaints (again, a small subset of the overall number
of modification-seeking homeowners) from roughly 12,000 to 15,000 down to 5,000 within a

---

[75] The lag time between when a homeowner filed a complaint with the Office of the
Comptroller of the Currency, or with a state Attorney General's office, began before the
complaints were submitted to BoA. By the time a homeowner could re-escalate, if their previous
regulatory or executive complaint was improperly closed, it would be too late for almost all of
them. This left the vast majority of homeowners in the position of having to accept the
solicitation of the proprietary (also known as "traditional" or "manual") modification. Mackler
began to identify an orchestrated process through which BoA led a homeowner into forbearance
and default to eliminate a customer's HAMP eligibility, leaving a homeowner with no choice but
to accept a predatory foist or lose the home.

matter of months. Again, the majority of these complaints were escalated claims by a regulator or homeowner objecting to treatment by BoA in handling a particular HAMP eligibility determination. Jim Emerick, a BoA ECR executive, communicated that Moynihan himself was checking in on the "pipeline" (the number of outstanding ECR complaints) daily in pursuant of this goal.

143.    Beranich emphasized that QCs and Advocates were going to need to work harder and commit to longer hours as needed to close all of the complaints that could physically be closed. He stated that everyone could potentially lose their jobs, including himself, if this could not be done to accommodate BoA's production demands. No additional QCs were hired to meet this increased demand for production. As the demand to close SRs continued, some QCs asked if they could "pass" SRs to meet the production goals without putting their personal identifier in the system of record, for fear of personal liability.

144.    The day that the "Drive to Five" was announced, QCs, Customer Advocates and others were directed to keep working well past the end of their shifts, to close as many claims as they could physically process. From that point forward, Customer Advocates were given crushing daily and weekly goals to meet – working early mornings to late evenings, working on weekends, and forgoing breaks during the day. Customer Advocate turnover (the "churn" rate) continued to grow as the pressure to fraudulently process unrealistic numbers remained unreasonable, and those physically unable or unwilling to comply were routinely terminated under fraudulent pretexts. BoA directed this process and was involved in the details of termination discussions, having sent a review team to examine which Advocates were not playing ball. Team Managers and Team Leads who failed to effectively "push the numbers" were also terminated or demoted.

145.    Farmer herself was later fired by order of Jim Emerick, the BoA executive at the center of the convergence between BoA's SGC group and its ECR group, for failing to sufficiently push Urban employees to drive down the backlog by closing on complaints, regardless of merit. This pressure from BoA was constant and delivered in no uncertain terms –

- 40 -

Urban would lose its lucrative BoA ECR contract if it failed to pass and close complaints utterly irrespective of Treasury-mandated guidelines for handling escalated complaints.

146.   Customer Advocates were not allowed to leave for the day until they and "the floor" had met their daily goal of SR closure, and were forced to come in and work on weekends if either they individually or "the floor" had not met the weekly goal BoA had established. At this point BoA began distributing a "red list" of particular SR numbers that had been identified by BoA ECR executives as needing to be closed without delay.

147.   Mackler at this time also noticed that the system of record was being routinely falsified. Whenever an Advocate would fail the QC process for not contacting the line of business to properly research the involved issues, the system would be updated (often within fifteen minutes) with fabricated emails from HRD Associates who were not even in-office to communicate with the Advocate at those hours. QCs were given absolute direction that they were not to investigate these improprieties, but instead to take everything submitted to the system of record at "face value." BoA personnel were observed "helping" Urban Advocates close files, and giving direction to fraudulently alter the system of record to allow closure.

148.   Ultimately the "Drive to Five" was considered a "success" by BoA, though it rendered scores of potential HAMP participants ineligible simply in order to meet an artificial requirement imposed by BoA.[76]

###   d.   Relator begins work on the "Root Cause" project

149.   In September of 2010, during the week following announcement of the "Drive to Five," Mackler was moved from his position as a QC into a new position as the Point Person for a BoA Root Cause Analysis project. Beranich made it clear to Mackler that neither Urban nor BoA knew how to make use of his talents, and that they "didn't know what to do with [him]" because he had not been willing to improperly and swiftly close files as either a QC or a Customer Advocate. He admitted that Mackler knew "too much" about the operation. Beranich

---

[76] Denver Post Article at 3. Mackler was included in leadership channel conversations where direction was given to fabricate cause for termination for countless employees and Team Managers.

discussed Mackler's intellect, knowledge and unique skillset, as well as his unwillingness to improperly close files, with Tom Reilly and others at BoA. Reilly, and others at BoA, directed Beranich to move Mackler to the Root Cause project, a project outside of ECR and instead within the realm of BoA's SGC group.

150.    The Root Cause project (later termed Root Cause-Denver) was designed by BoA to report not through ECR, but rather through SGC as a risk analysis audit to discern what business practices were evident or transparent to regulatory agencies and homeowners, *i.e.*, to determine what fraud a homeowner could detect or an outside party examining BoA's business practices could detect looking only at internal systems. Specifically, BoA wanted to know what information (potentially incriminating information) was transparently observable from internal systems should it be subpoenaed.

151.    In this position Mackler reported directly to Eric Marsing (former Countrywide First VP, now BoA SVP in SGC) and no longer up through Urban. Tiffany Harrison (BoA AVP in SGC) worked for Marsing and Mackler spoke with both she and Marsing regularly in the months that followed. Harrison and Marsing both technically reported to Tom Trujillo (BoA) who himself reported to Jim Emerick. In reality the Root Cause group worked for the BoA Risk Committee, with cross-reporting relationships throughout corporate BoA, SGC and the respective lines of business.

152.    Mackler managed the Root Cause-Denver project, including the team of analysts[77] and was deemed the Project Point Person by BoA executives for the program, until its dissolution in March of 2012. Root Cause-Denver examined Default Servicing, working with BoA six-Sigma engineers and BoA Process Design Consultants within Default Servicing (referred to as "Mod Space" or modification space) as well as with ECR and Servicing Quality Associates. Root Cause-Denver additionally looked at Financial Protection Services, Balboa Insurance Group, as well as Sales and Fulfillment (Origination).

---

[77] The analysts were Nikki Bakkal, Bob Truesdale, Vang Lee, Wesley White, Laquanda Ellison, Wanda Wasielewski, Keysha Baker (who was removed from the project) and eventual QC coordinator Paul Langer.

153.     The Root Cause team received a pre-selected sample of high-risk regulatory and homeowner complaints, complaints containing allegations of real concern to BoA's Risk Committee, and examined them to determine what information existed on Urban or BoA systems to either rebut or confirm the allegations in the homeowner complaints.

154.     Marsing sold this new position to Mackler on the argument that, given Mackler's constant expression of concerns about fraud, he could now officially work to determine what "mistakes" were being made in operation of the HAMP reviews, and would "work with the line of business" to fix and correct those. In fact, as was explained later, BoA wanted to learn what degree of exposure it was facing, particularly with respect to what Congress or Treasury might do if it accessed BoA's internal systems in an effort to detect wrongdoing. Marsing acknowledged the political ramifications and reputational risk that could emerge from these audits, thus emphasizing their importance and sensitive nature.

155.     Mackler worked with Marsing and Harrison to manage the unique team issues that resulted from Root Cause analysts being exposed to such a large sample of information revealing illegal and fraudulent business practices that BoA employed. BoA directed that the nature of the audits that RC-Denver would be exposed to were so confidential in nature that no one from the RC-Denver team was to discuss the results with anyone else at BoA or Urban. This information was only to be communicated to Marsing or Harrison.

156.     Roughly half of the audits conducted by the group (then reviewed by Mackler) consisted of homeowner complaints, often forwarded by individual members of Congress, or inquiries from the Office of the Comptroller of the Currency (OCC), State Attorneys General, or other regulatory agencies, in which a business practice was alleged that had significant regulatory or political exposure. The other half consisted of internal BoA records where an employee documented a business practice that, while accurate, created exposure for the Bank and therefore did not follow the (fraudulent) Bank protocols. The results of the audits were synthesized by Mackler into higher level observations, and then presented by Harrison and Marsing to the BoA Risk Committee.

- 43 -

157. Marsing and Harrison emphasized to Mackler and the Root Cause group that the company was not attempting to "catch" wrongdoers at BoA. Harrison and Michelle Dean, a BoA Default Servicing Process Design Consultant, repeatedly emphasized that homeowner complaints about BoA's claim of "missing" HAMP documents (even where homeowners could document repeatedly sending this information) should in fact be captured by Root Cause as merely a "communication" failure ("fail point") or as being the fault of the homeowner ("Customer Adherence"). In this manner, BoA could continue to hide the wrongdoing from internal controls, homeowners, Congress, and the Treasury Department. Thus BoA was able to perpetrate fraud even within the group ostensibly charged with uncovering it.

158. Mackler was given repeat direction from Marsing and Harrison regarding what was "fair game" to capture versus what the line of business wanted reported. Additionally, Mackler was invited to substantively alter allegations of fraud and overt business practices where they had not been properly identified. Mackler gave his team of analysts direction to capture "what they saw" as they had been initially trained. Eventually the line of business, Default Servicing, began fraudulently changing the results of the RC-Denver team's audits without their knowledge or consent, while directing them to change the "results" of certain audits that identified falsity in the "HAMP document dialog." Mackler complained about this, and was told by Marsing and Harrison that lines of business could determine certain things to be "off-limits" to the Root Cause group. It was up to the BoA line of business to decide how much to cooperate.

159. Over the course of the next six months, after reviewing thousands of audits by his team and receiving constant direction from BoA executives, it became more evident to Mackler that Root Cause was never designed to identify fraud so as to prevent it, but to identify it so as to remove the evidence of that fraud from the system records.[78] Mackler participated in high-level

---

[78] In fact, the Siebel computer system of record for regulatory and customer complaints was amenable to *ex post* "correction" by Urban or BoA employees, in fact correction without detection. In early 2011, Mackler overheard BoA relationship manager Raisley giving direction to "scrub" or clean records from the Siebel system when evidence did not correspond to the fraudulent manner in which an SR was closed.

- 44 -

Risk conference calls with BoA executives, Six-Sigma Engineers, Process Design Consultants,[79] and others in Change Management and the Root Cause Transformation Sub-Committee where it was made even more clear that BoA's HAMP fraud was orchestrated, and entirely by design.

160.    By examining each audit, Mackler observed and was able to document a number of discrete fraudulent practices BoA had developed and maintained in contravention of the HAMP requirements. These audits went back to the beginning of the HAMP rollout in early 2009 and directly confirmed that the fraudulent practices and protocols have been part of BoA's HAMP operations since its inception:

    a.  Mackler learned of the existence of the Urban Portal where original financial documents submitted by homeowners were concealed and not accessible to HRD Associates who were reviewing the homeowners for HAMP modification eligibility, neither were these documents available to Customer Advocates when reviewing related concerns. Access would show that homeowners had *in fact* often timely and satisfactorily complied with submission requirements (such fraud translating into improper fees and improper determinations of ineligibility). Mackler discovered that Urban had been contracted to develop this seemingly redundant imaging repository;[80]

    b.  He repeatedly saw examples of homeowners whose complaints were responded to in a fraudulent manner, including by failing to disclose bank errors and misconduct, and falsely telling the regulator or homeowner that his or her application was still "under review" even while simultaneously

---

[79] BoA VP/Process Design Consultant Michelle Dean actively worked to prevent Mackler from "capturing" fraud and having such "design" flaws presented to the BoA Risk Committee. Dean consistently directed Mackler, both during his time at Root Cause and in his final weeks with Urban as an In-Line Auditor, to cover-up fraudulent practices.

[80] Dean informed Mackler that another contractor, Stuart, had been tasked to document in the system of record whether homeowners' HAMP documents had been received or were incomplete, without having access to the Urban Portal. In other words, without being able to see whether they had, or had not.

documenting that the application was "incomplete or missing financials" so as to quickly close the file and terminate the HAMP review;

c. Mackler observed the common BoA practice of intentionally delaying either modification reviews or responses to homeowner inquiries (with the intent that such delay would ultimately cause HAMP ineligibility, given the time period requirements of the Program). This included by "parking" HAMP reviews under the operator IDs of terminated or vacationing HRD employees so as to allow them to age-out and lose HAMP eligibility. This "parking" also often entailed improperly requiring new financials be submitted thus delaying review further and intentionally failing to advise homeowners at risk of losing potential eligibility;

d. As he saw previously, Mackler reviewed numerous audits his team conducted where homeowners were improperly proceeded against in foreclosure while BoA was falsely telling them, or regulators, that such homeowners were under "review" for HAMP modification;

e. As he also saw during his time as a Customer Advocate and QC, Mackler's team audited numerous instances where homeowners provided substantial payments, sometimes under their respective Trial Period modification, but were not properly credited with such payments, thereby risking ineligibility, because those payments were instead parked in a "partial account" as a partial balance not applied to their HAMP obligations (even after the "partial account" balance would constitute more than a full "note" payment as required by HAMP);

f. Mackler's team audited several files highlighting homeowner complaints that they had qualified for HAMP under the NPV algorithm and other requirements, but were improperly placed into proprietary modifications in

- 46 -

> violation of requirements that BoA properly consider the homeowner for
> HAMP eligibility in the first place; and
>
> g. Numerous instances of persons deemed ineligible for permanent modification
> status based upon failure to apply proper criteria for conversion from trial
> status to permanent status.

161.    These fraudulent practices, and Urban's exposure resulting from its participation
in them, were brought by Mackler to the attention of Urban President Jim Smith and other top
executives at Urban in the fall of 2010. Smith responded, during one meeting that included most
of Urban's top executives, that Mackler and his Root Cause team "needed to remember who they
worked for" (meaning Urban). Smith also expressed anger that Mackler was regularly
discussing these matters with BoA executives, despite Mackler's explaining that the orders on
Root Cause required such regular contact to report to BoA on the audits, and that he was under
specific orders not to discuss the details of these audits.

162.    In a subsequent follow-up meeting with Deborah Adams (AVP of Client
Relations at Urban) and then another with Adams and Beranich, Mackler detailed again the
fraudulent practices he had observed and was auditing. Adams stated that the goal coming from
BoA was specifically *not* to help place homeowners into the HAMP modification process, but
instead, to close files by determining HAMP ineligibility. Mackler was encouraged to focus on
the fact that for Urban employees, the client was BoA, not the various homeowners. That was
the task Urban was contracted to help expeditiously complete with BoA. Beranich, who then
joined the conversation, at one point expressed curiosity whether Mackler was wearing a
recording device and recording the conversation.

163.    In January of 2011, David Stevens (whose father Glenn Stevens was at that point
General Counsel for Urban) joined the Root Cause project in the role of Team Lead, as part of
his rotating executive position within Urban. Mackler discussed *ad nauseum* with Stevens the
fraudulent practices detailed above. Stevens listened, but no action to address these practices "on
the floor" was ever taken.

- 47 -

164. On January 25, 2010, Mackler met with McManaman, at that point Urban's Production Manager for Quality and Special Projects. McManaman was under intense pressure to facilitate increased production for both the Regulatory Response team (RRT-Denver) and Business Process Outsourcing 150 (BPO-150) team, as neither were able to meet their crushing daily or weekly BoA-established production goals while also meeting proper HAMP escalated complaint guidelines. Beranich routinely threatened to terminate McManaman unless she directed her Quality management team (Team Leads of QCs, and Team Leads of In-Line Auditors) to force their reporting employees to "pass through" SRs and audits. The "production" conversation became the defining context of the Quality review teams, to the point that QCs and Quality auditors were forwarded the number of QCs or audits they were assigned along with the number of "closures" needed before anyone could go home.[81]

165. McManaman explained to Mackler that she had come to the realization she was inevitably going to be fired. Mackler told McManaman she should be careful of the direction that she was taking from BoA and cascading to her reports, since she could be personally at risk for "following direction by giving direction" to close cases fraudulently, and to falsify the system of record to obfuscate that. McManaman explained that everything she was doing was being done at the direction of the Bank, communicated through BoA "handlers" or relationship managers Robbie Nicholson and Kristina Raisley.

166. During this January 25, 2011, conversation, Raisley (on-site BoA relationship manager at this point) walked in and stated that the daily goal had not been met, and that the Quality standards needed to be "adjusted" to allow for closure of a significant number of SRs. This rhetoric was a daily business practice of BoA by this point. McManaman said she would no longer go along with this. Raisley directed that she didn't have a choice and that if McManaman

---

[81] As standard practice, Team Leads emailed audits of the day to auditors, with language revealing that the audits "needed" to be closed before anyone could go home. Urban needed to "find a way" to "sharpen the pencil" and "pass through" the SR closures. A significant number of SRs were being closed based on a "manager exception," which acknowledged that the SR did not meet proper protocols, but a manager had granted permission to close the regulatory or customer complaint without proper research, resolution, or forward progress.

- 48 -

did not go along with it, BoA would replace her with someone who would (as they had done on countless other occasions). Raisley said that the Bank would bear all responsibility for these closures and that Urban would "not be responsible" for the manner in which they were closed.

167.    McManaman explained that she could no longer go along with the fraud, emphasizing to Raisley that homeowners were being irreparably harmed by the improper HAMP review practices, the lack of good faith ECR research and response, and lack of resolution. Raisley sarcastically retorted that if the homeowners were unsatisfied they could always re-escalate. Unfortunately for homeowners this was not an option, especially considering the timeline and lifecycle of foreclosure proceedings and modification reviews.

168.    Raisley left the room and escalated the issue with Urban AVP Justin Svoboda. Svoboda then came into McManaman's office and directed that whatever the client BoA wanted, she needed to accommodate. McManaman pleaded with Svoboda that SRs that could be properly closed were closed, and that nothing else met proper guidelines and could only be closed by fraud. She emphasized the implications of fraudulently closing SRs and falsifying the QC and In-Line Audits, particularly for homeowners. Svoboda made clear that meeting BoA's production goals took priority, not homeowner concerns, as that was the basis for Urban's contract.[82]

169.    At the end of February 2011, Mackler was informed by Urban that the Root Cause project was being cancelled by BoA. Urban executive Jason Taylor (SVP of Outsourced Services) told Mackler that RC-Denver did not fit within the Urban corporate structure, and was not part of the ECR contract with BoA (*i.e.*, not covered by the vendor "Statement of Work"). After that date, Mackler never again verbally spoke to Marsing or Harrison, or worked on Root Cause audits.

_____

[82] Both McManaman and Mackler drafted and signed statements describing these January 25, 2011 conversations, out of concern that they needed to protect themselves. They are attached here as Appendix II, Exhs. A-D.

- 49 -

    e.  **Root Cause project is dissolved and Relator is terminated**

  170. After the dissolution of Root Cause, Mackler was offered two low-level positions within Urban: document chaser (which was a demotion from being a Customer Advocate) or a Quality position as an In-line Auditor. Both of these positions were significant demotions for Mackler who had held project management responsibilities, and served as a BoA project Point Person.

  171. Mackler explained to Urban principals that he could not in good conscience go back to a floor-level position that required him to confront and acquiesce in the daily fraud occurring for BoA at Urban. Mackler felt it was unreasonable for him to be complicit in the fraud, based on his operational knowledge. For over a week, Mackler attempted to work as an In-Line Auditor but became aware that retaliation against him had already commenced. He continued, in that position, to object to the ongoing fraud.

  172. On March 17, 2011, Mackler was terminated in retaliation for his complaints about fraudulent activity surrounding BoA's HAMP operation.

**B. Bank of America Violates the False Claims Act**

  173. BoA fraudulently entered into its Servicer Participation Agreement with BoA by untruthfully pledging to develop and maintain a compliant HAMP operation. It has, since that time, falsely certified its compliance with HAMP requirements, most recently on June 1, 2011.

  174. BoA has acted in violation of various obligations in the Agreement, such violations contravening material conditions, and conditions precedent, to payment of claims under the Agreement. Such violations render each and every claim for payment of HAMP funds both false and fraudulent.

  175. Contrary to its Agreement, BoA does not and has not "adhere[d] to the Program standards...for all the servicer's loans."[83] Though obligated by the unequivocal terms of the Agreement to follow all HAMP requirements (BoA "shall perform the loan modification and

---

[83] December Report at 14.

other foreclosure prevention services described in ... the 'Program Documentation'")[84] as a condition of participation and payment, "satisfaction by Servicer" of these obligations has not been honored.[85]

176. BoA, in contravention of its obligations, has failed by design to maintain an "effective[ ] internal control program" to "ensure effective delivery of Services" and "compliance" with the HAMP guidelines, which explains, in part, why BoA has failed to comply with its HAMP obligations.[86] BoA has not performed HAMP services "with the practice, high professional standards of care, and degree of attention used in a well-managed operation," much less has it performed with the degree of care BoA "exercise[s] for itself under similar circumstances."[87]

177. BoA has violated the HAMP requirement to "use qualified individuals with suitable training, education, experience and skills to perform [HAMP] Services."[88] Despite its abysmal HAMP performance, resulting this month in suspension of Treasury payments to it, BoA has failed to "disclose ... any facts or information that [the Government] should reasonably expect to know about [BoA] and its contractors."[89] Though "responsible for the supervision and management" of the contractors it engages to perform HAMP services, BoA fails and has failed to "ensure that all of its contractors comply with the terms and provisions of the Agreement" despite being "responsible for the acts and omissions of its contractors as if the acts and omissions were by [BoA]" itself.[90]

178. Again this year, BoA has falsely certified, as it has in each Certification, that it has "performed its obligations in accordance with the Agreement..." and that "all Services have

---

[84] Agreement, Sec. 2.A.

[85] Agreement, Sec. 4.A.

[86] Financial Instrument, Sec. 4(a).

[87] Financial Instrument, Sec. 5(d).

[88] *Id.*

[89] Financial Instrument, Sec. 5(g).

[90] Financial Instrument, Sec. 6.

been offered by Servicer to borrowers, fully documented and serviced by Servicer in accordance with the applicable Program Documentation."[91]

179. BoA's violation of specific HAMP requirements, all part of the Program Documentation binding on BoA under terms of the Agreement, is systemic and material. As alleged, BoA continues to and has, *inter alia*, failed to extend invitations to HAMP participation to scores of potentially qualified homeowners (often foisting predatory proprietary modifications upon them instead); failed to review eligibility for such homeowners in good faith; failed to properly credit HAMP payments and waive other fees;[92] failed to review documentation in a timely, good faith manner;[93] failed to review and resolve homeowner "inquiries and complaints...with fair consideration, and timely and appropriate responses and resolution;"[94] failed to accurately record and retain all records, including actual reasons for HAMP denials, and fraudulently required multiple submissions of documents from homeowners;[95] failed to suspend foreclosure activity where required by HAMP;[96] and failed to properly handle inquiries and complaints, including "escalated" cases, in good faith.[97] Each of these practices occurs in obvious violation of Program Documentation.

180. Violation of these core provisions of the Servicer Participation Agreement and the Program Documentation incorporated therein has resulted in violations of the False Claims Act

---

[91] Annual Certification, Sec. 3, and Updated and Restated Certification at C-1, Sec. 3, available at https://www.hmpadmin.com/portal/programs/servicer.jsp; Handbook at 38.

[92] Handbook, Sec. 8.1 at 79; Directive 09-01 at 22.

[93] *See* Directive 09-01 at 5, amended later by subsequent Directives imposing abbreviated time periods for Servicer review.

[94] *See* Directive 09-01 at 13 (including by intentionally delaying responses to homeowners and otherwise failing to communicate with them).

[95] *See* Directive 09-01 at 13; Handbook at 46, 52 (including by maintaining a fraudulently concealed document image repository inaccessible to customer advocates and others).

[96] *See* Directive 09-01 at 14; Handbook at 53. Mackler experienced the difficulty in convincing Foreclosure Technicians with BoA to delay or halt foreclosure sales or other activity. Customer Advocates were routinely informed by foreclosure personnel that procedures in place prevented delaying or suspending foreclosure activity once the activity had begun.

[97] Handbook at 46 ("Servicers must have written procedures and personnel in place to provide timely and appropriate responses to borrower inquiries and complaints in connection with HAMP within the timelines specified in this Handbook").

- 52 -

by rendering BoA ineligible for Government payments under the terms of the Program. BoA's

violations are material to the Government's decision to make said payments, and had the

Government been aware of BoA's conduct in violation of its Agreement, the Government would

not have paid these monies, just as it is now suspending further payments to this offending Bank.

## VI.    CONCLUSION

181.    In 2010, the Congressional Oversight Panel observed:

> [S]ervicers need to face 'meaningful monetary penalties" for
> noncompliance with SPAs [Service Provider Agreements[]] and
> denial of modification for an unexplained reason, a breach of their
> contractual obligations under HAMP SPAs.[98]

182.    The Treasury Department determined last month that BoA's abysmal

performance under the HAMP Agreement is unacceptable and warranted suspension of further

federal government payments to it.[99]  Evidence now provided by Relator lays bare the previously

concealed mechanisms and practices by which BoA has knowingly and willfully failed to

perform under the Agreement since its inception, and why each claim for payment under HAMP

has been a false claim.

183.    As plainly stated in the Agreement, conditions precedent to Government payment

require the faithful implementation of a HAMP modification program. As Treasury has now

concluded, permitting a reduced number of eligible homeowners to take advantage of a HAMP

modification is insufficient to establish actual performance under the requirements of the

Agreement, particularly where, as here, BoA's performance under the Agreement is calculated to

undermine the ability of scores of eligible borrowers to qualify.

184.    Simply put, BoA has made a mockery of a program designed by Congress and the

Treasury Department to help millions of struggling American homeowners.

185.    Incentive payments and any other payments to BoA under the terms of its

Agreement have been obtained, and are retained, through fraud. Because such conduct violates

---

[98] December Report at 50.

[99] *See* fn.3, *supra.*

- 53 -

the False Claims Act, BoA is liable to the federal Government and needs to be held accountable to the American taxpayers for its actions.

## COUNT I

## FEDERAL FALSE CLAIMS ACT

### 31 U.S.C. § 3729(a)(1)(A)

186.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

187.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

188.    Through the acts described above, since the inception of the HAMP in 2009, Defendants knowingly presented or caused to be presented false or fraudulent claims, records or other materials for payment or approval resulting in significant payments of false claims by the Government to Defendants.

189.    Through the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Government to pay or approve such false or fraudulent claims.

190.    Each payment by the United States under the terms of the Servicer Participation Agreement was the product of a false claim and materially false statements made by the Defendants. Defendants, due to their fraudulent conduct, rendered themselves ineligible for payments under the Agreement because they, with knowledge and by design, were not and are not in compliance with material terms of the Agreement that are conditions for payment.

191.    The United States, unaware of the falsity and fraudulent nature of Defendants conduct as it relates to the terms of the Agreement, and of the records, statements, and claims made or caused to be made by Defendants, has paid and may continue to pay millions of dollars for claims that would not be paid were the Government aware of Defendants knowing violation of the Agreement and the False Claims Act.

- 54 -

192.   By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

## COUNT II

## FEDERAL FALSE CLAIMS ACT

### 31 U.S.C. § 3729(a)(1)(B)

193.   Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

194.   This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

195.   Through the acts described above, since the inception of the HAMP, Defendants knowingly made, used, and caused to be made or used false records or statements material to such false or fraudulent claims resulting in significant payments of false claims by the Government.

196.   Through the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Government to pay or approve such false or fraudulent claims.

197.   Each payment by the United States under the terms of the Servicer Participation Agreement was the product of a false claim and materially false statements made by the Defendants. Defendants, due to their fraudulent conduct, rendered themselves ineligible for payments under the Agreement because they, with knowledge and by design, were not and are not in compliance with material terms of the Agreement that are conditions for payment.

198.   The United States, unaware of the falsity and fraudulent nature Defendants conduct as it relates to the terms of the Agreement, and of the records, statements, and claims made or caused to be made by Defendants, has paid and may continue to pay millions of dollars for claims that would not be paid were the Government aware of Defendants knowing violation of the Agreement and the False Claims Act.

- 55 -

199. By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

## PRAYER

WHEREFORE, Relator prays for judgment against Defendants as follows:

A. That Defendants cease and desist from violating 31 U.S.C. § 3729, *et seq.*;

B. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

C. That Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act;

D. That Relator be awarded all costs of this action, including attorneys' fees, costs, and expenses pursuant to 31 U.S.C. § 3730(d); and

E. That the United States and Relator be granted all such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff-Relator hereby demands a trial by jury.

Dated: July 6, 2011

HAGENS BERMAN SOBOL SHAPIRO LLP

By: _____
Shayne C. Stevenson
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
Telephone: (206) 268-9340
Facsimile: (206) 623-0594

*Attorney for Plaintiff/Relator Gregory Mackler*

- 56 -